## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **PROJECT VERITAS,** | : | **Case No.** |
| | : | |
| **PROJECT VERITAS ACTION FUND,** | : | **Judge** |
| | : | |
| *and* | : | **Magistrate** |
| | : | |
| **JAMES O'KEEFE** | : | |
| | : | **VERIFIED COMPLAINT** |
| | : | |
| Plaintiffs, | : | **Exhibit A:** *Affidavit and Verifying Affidavit of* |
| | : | *PVA Executive Director Russell Verney* |
| -vs- | : | |
| | : | **Exhibit B:** *October 2018 OEC Complaint filed* |
| **OHIO ELECTIONS COMMISSON,** | : | *against Plaintiffs* |
| | : | |
| **DEGEE WILHELM,** | : | **Exhibit C:** *January 8, 2019 Order of the OEC* |
| | : | |
| **CATHERINE CUNNINGHAM,** | : | **Exhibit D:** *Correspondence from OEC Director* |
| | : | *Phil Richter* |
| **D. MICHAEL CRITES,** | : | |
| | | **Exhibit E:** *Partial Transcript of OEC* |
| **OTTO BEATTY III,** | | *Proceedings Illustrating Vagueness* |

**DENNIS BROMMER,**

*and*

**SCOTT NORMAN, each in their official capacity as
member of the Ohio Elections Commission,**

**Defendants.**

Now come Plaintiffs, PROJECT VERITAS, PROJECT VERITAS ACTION FUND, and JAMES

O'KEEFE (collectively, the "Plaintiffs"), and for their Complaint against the OHIO ELECTIONS

COMMISSION and the MEMBERS OF THE COMMISSION ("defendants") allege as follows:

## INTRODUCTION

1.     This is an action for declaratory judgment, preliminary and permanent injunction, and nominal damages under 42 U.S.C. §1983 arising from Defendants' unconstitutional official conduct, policies, practices, regulations, restrictions, threats, intimidation, and/or harassment.

2.     Specifically, Defendants maintain that they may inhibit Plaintiffs, when in Ohio, from reporting unapproved information that is acquired through investigating a political campaign while undercover.

3.     Due to Defendants' official conduct, Plaintiffs have suffered and will continue to suffer irreparable harm to their rights under the First Amendment to the United States Constitution and the Fourteenth Amendment to the United States Constitution.

4.     This harm may only be remedied by a ruling from this Court, and Defendants must be immediately and permanently be enjoined from further restricting Plaintiffs' constitutionally-protected truthful investigative journalism on political campaigns.

## PARTIES

5.     Plaintiff Project Veritas Action Fund ("PVA") is a non-profit organization that engages almost exclusively in undercover journalism to report to the public about instances of corruption, fraud, waste, and abuse.  ***Exhibit A, Affidavit of Russell Verney.***

6.     PVA publishes its reports with an intent to better educate the public . . . by going undercover and revealing its findings.  *Id.*

7.     PVA is not a political organization, does not take stances on controversial political topics, does not endorse, support, or oppose candidates for election, and spends its time, energy, and resources engaged in newsgathering and reporting.  *Id.*

8.     Because PVA focuses on public corruption, government wrongdoing, and the inner workings of political campaigns, it often reports on public servants and candidates for public office.  In doing so, PVA's intent is to uncover facts and report them, not sway voters for or against particular candidates or issues.  *Id.*

2

9.      Plaintiff Project Veritas ("PV") is a tax-exempt public charity pursuant to Section 501(c)(3) of the Internal Revenue Code.

10.     PV neither advocates for specific resolutions to issues that are raised through its investigations, nor urges others to do so.

11.     PV strives to inform the public of wrongdoing and allow the public to make judgments on the cases.

12.     PV's mission is to "investigate and expose corruption, dishonesty, self-dealing, waste, fraud, and other misconduct in both public and private institutions in order to achieve a more ethical and transparent society."

13.     PV's practice is to launch an investigation with the placement of its undercover journalists, followed by a rollout of facts displaying corruption.

14.     While PV does engage in reporting on candidates and campaigns, PV does not engage in activities or speech that urge the election or defeat of any candidate for elected office.

15.     Plaintiff James O'Keefe is the founder and President of both Project Veritas and Project Veritas Action Fund.

16.     Plaintiffs, whether through Project Veritas or Project Veritas Action Fund, have recently initiated undercover investigations of and reports on political campaigns and candidates, Google, YouTube, Facebook, Chase Bank, Planned Parenthood, Pinterest, and labor unions.

17.     Courts have previously described Project Veritas and Project Veritas Action Fund as "both nonstock, nonprofit corporations founded by James O'Keefe," whereby "PVAF is an 'arm' of PV, and O'Keefe is the President of both corporations." See *Democracy Partners v. Project Veritas Action Fund* 285 F. Supp. 3d 109 (D.D.C. 2018).

18.     Plaintiffs' journalistic techniques, tactics, and practices primarily consist of recording and publicizing political wrongdoing: one District Court recently quoted Plaintiff O'Keefe in striking down a Massachusetts recording limitation, "I would love to probably secretly record a whole bunch of people

because that's what I do. I think it's a very important and valuable kind of journalism." *Martin v. Gross,* 340 F. Supp. 3d 87 (D. Mass 2018).

19.     In Ohio in 2016, a PVA investigator used undercover tactics to ascertain then-U.S. Senate candidate Ted Strickland's "behind-the-scenes" positions on "coal and firearms," resulting in the publication of a video on the subject. *See Exhibit A, supra.*

20.     Defendant the Ohio Elections Commission ("OEC") is an administrative body charged, pursuant to Chapter 3517 of the Ohio Revised Code, with enforcement of multiple Ohio elections laws, including R.C. 3517.21(A)(1).

21.     Defendants Wilhelm, Cunningham, Beatty, Crites, Norman, and Brommer are, in their official capacities, currently serving as members of the OEC.

22.     The OEC Member Defendants, in their official capacities, receive, review, and determine cases arising pursuant to Chapter 3517, of the Ohio Revised Code, including claims made pursuant to R.C. 3517.21(A)(1).

23.     The OEC Members are empowered, pursuant to R.C. 3517.22 and R.C. 3517.155(A)(1)(c), to render decisions and opinions, impose fines, refer matters for criminal prosecution, issue subpoenas, compel the appearance of witnesses and the production of documents.

24.     The actions of Defendants described herein were taken pursuant to official conduct on behalf of the Ohio Elections Commission and the State of Ohio, and were exercised under color of law.

25.     Defendants have, in their official capacity of adopting and implementing a policy, practice or custom of the State and/or the Commission, taken and continue to threaten to undertake specific action that violates the constitutional rights of the Plaintiffs.

26.     All actions by the Defendants described herein were undertaken under color of state law and caused the deprivation of Plaintiffs' rights protected by the United States Constitution and the Ohio Constitution.

27.     Defendants have chilled Plaintiffs' speech, and until enjoined, will maintain and enforce regulations that will continue to do so.

## FACTUAL ALLEGATIONS

### *The State of Ohio's Suppression of Critical Investigative Reporting on Politics*

28.   In Ohio, no citizen, whether deemed a "journalist" or otherwise, may "go undercover" within a political campaign to acquire and report unapproved information about that politician or campaign - - even if the information in question is truthful, informative, and helpful to the public - - without risking subjection to OEC hearings, fines, and even imprisonment.

29.   R.C. 3517.21(A)(1)(the "Reporting Restriction") provides as follows:  (A) No person, during the course of any campaign for nomination or election to public office or office of a political party, shall knowingly and with intent to affect the outcome of such campaign do any of the following:  (1) Serve, or place another person to serve, as an agent or employee in the election campaign organization of a candidate for the purpose . . . of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization."

30.   R.C. 3517 fails to define "intent to affect the outcome," "campaign", "outcome", or "elections campaign organization."

31.   The Reporting Restriction applies irrespective of whether the investigative reporting constitutes an otherwise-regulable "independent expenditure" or is coordinated with an opposing campaign.  *See* R.C. 3517.01(A)(17).

32.   Once "any person" files a complaint pursuant to the Reporting Restriction, the Ohio Elections Commission holds a mandatory hearing, as required by law:  R.C. 3517.153 *requires* the OEC to "proceed" on such complaints, even if simply made "by affidavit of *any person*."   R.C. 3517.153(A)(Emphasis added); see also R.C. 3517.155(A)(1) and R.C. 3717.156(A), (B), and (C).

33.   Thereafter, the OEC may "issue subpoenas to any person in the state compelling the attendance of witnesses and the production of relevant papers, books, accounts, and reports."  R.C. 3517.153(B).

34.   Once OEC proceedings are completed, a criminal prosecution may ensue, the OEC may "impose a fine," or the OEC may "refer the matter to the appropriate prosecutor."  R.C. 3517.153(C); R.C.

3517.155(A)(1)(b) and (c); see also R.C. 3517.992(V) ("Whoever violates section 3517.21 or 3517.22 of the Revised Code <u>shall be imprisoned for not more than six months or fined not more than five thousand dollars, or both.</u>" (emphasis added)).

### *The OEC's Enforcement of the Reporting Restriction against Plaintiffs*

35.     The OEC applied the Reporting Restriction against Plaintiffs at the behest of Plaintiffs' political rival,[1] "Democracy Partners."

36.     In retaliation for the embarrassment it experienced due to prior PV investigative reporting, Democracy Partners - - as literally *anyone* could - - weaponized Ohio's arbitrary election regulations: on October 1, 2018, Democracy Partners "partner" Lauren Windsor filed a complaint with the Ohio Elections Commission against Project Veritas Action Fund, James O'Keefe, Allison Maass, and others. *See Exhibit B.*

37.     The Complaint alleged that "Project Veritas broke Ohio elections law," more specifically R.C. 3517.21(A)(1), by "*publishing videos* . . . featuring clips filed surreptitiously by different operatives within the Grove City, Ohio coordinated campaign office of the Ohio Democrat Party for the Hillary Clinton and Ted Strickland campaigns." *Id*.

38.     The Democracy Partners' Complaint alleged that "the problem for James O'Keefe and company is that embedding agents within political campaigns is illegal in the state of Ohio." *Id.*

39.     The Democracy Partners' Complaint further alleged that "Based on interviews and evidence provided by several ODP staffers, and evidence found within Project Veritas' own video publication, O'Keefe placed at least two people in the election campaign organizations of two candidates for the

---

[1]     After PV infiltrated and reported on wrongdoing within Democracy Partners, Democracy Partners complained that PV "infiltrated Democracy Partners' offices . . . and secretly recorded hours of conversation;" it then, in 2016, "on October 17, 18, 24 and 26th, released a series of videos to PV's YouTube channel that contained footage from . . . recordings . . . of Democracy Partners, and its clients." See *Democracy Partners v. Project Veritas Action Fund* 285 F. Supp. 3d 109 (D.D.C. 2018).

purpose of reporting information . . . the video itself *[reported on] the candidate's stances on contentious issues*." *Id.*

40. Pursuant to R.C. 3517.154, the OEC proceeded to adjudicate the case even after it reviewed the complaint and PV's written objections.

41. After a substantive hearing, which Plaintiffs attended through legal counsel, the OEC dismissed the claims against Project Veritas, but only due to the statute of limitations, rather than on the merits, stating "On November 15, 2018 after careful consideration of the evidence, the Ohio Elections Commission adopted the following finding(s) : The Commission dismissed the matter as the Complaint was not filed within the Commission's 2-year statute of limitations. The Commission then denied the request to find the matter frivolous." ***See Exhibit C (January 8, 2019 Order of the OEC)***.

42. Subsequent to the OEC's Order, OEC Director Phillip Richter observed that, on the merits, "this was probably the closest case that has ever been presented to the Commission." ***See Exhibit D (Correspondence with Phil Richter).***

### *The Reporting Restriction Chills Plaintiffs' Investigative Reporting*

43. In response to the risk of such litigation and sanctions, Plaintiffs have refrained from engaging in further investigative reporting in Ohio since the OEC litigation concluded.

44. The State of Ohio is the location of significant political campaign activity, and Plaintiffs anticipate significant ongoing campaign activity by federal campaigns and candidates beginning in the fall of 2019, leading up to the March 10, 2020 primary elections, and then through the November 3, 2020 general elections and beyond.

45. Plaintiffs maintain plans to investigate, within Ohio, several candidates and election campaign organizations that are either headquartered in Ohio or will be active within Ohio from October 1, 2019 through November 1, 2020 and beyond.

46. In particular Plaintiffs plan to investigate and report on instances of candidates for President of the United States and United States Congress publicly proclaiming positions that differ from their actual

intentions on issues that are important to Ohioans, such as policies regarding energy, the environment, taxation, immigration, health care, unionism, race, feminism, terrorism and foreign policy, and socialism.

47.    Plaintiffs plan to accomplish the foregoing investigations by secretly investigating and recording, in public places, interactions of and between campaign staffers or candidates.

48.    Plaintiffs plan to investigate, record, and report the foregoing in a manner substantially similar to the methods they used to investigate, record, and report on the Strickland and Clinton campaigns in Ohio in 2016.  *See https://www.projectveritasaction.com/2016/10/05/undercover-okeefe-exposes-ted-stricklands-true-positions-on-coal-and-guns/*.

49.    Plaintiffs' investigations often lead them to the discovery and pursuit of facts, issues, or individuals other than those originally intended, and such discoveries may result in Plaintiffs' pursuit of individuals or entities other than those listed above.

50.    Plaintiffs will need to alter or eliminate their plans if the Reporting Restriction persists, because the Restriction essentially criminalizes Project Veritas' proven and most effective practices.

51.    If the foregoing investigative reporting is pursued in Ohio, the methods utilized by Plaintiffs would subject them to civil and criminal liability pursuant to the Reporting Restriction because their methods necessarily require the service of a Veritas reporter, during a political campaign, within the campaign of a candidate for public office for the purpose of reporting unapproved facts without that candidate or campaign's knowledge.

52.    But for the Reporting Restriction, Plaintiffs would undertake the foregoing investigative reporting.

## JURISDICTION AND VENUE

53.    Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

54.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as this action arises under the First and Fourteenth Amendments to the United States Constitution; under 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and

immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to recover damages and secure equitable relief under an Act of Congress, specifically, 42 U.S.C. § 1983, which provides a cause of action for the protection of civil and constitutional rights; under 28 U.S.C. § 2201(a), to secure declaratory relief; under 28 U.S.C. § 2202, to secure preliminary and permanent injunctive relief and damages; and under 42 U.S.C. § 1988, to award attorneys' fees.

55.     Venue is proper within this judicial district and division pursuant to 28 U.S.C. § 1391(b) and Local Rule 3.8, as (i) the Defendants are situated within this judicial district and division; and (ii) all of the claims asserted by Plaintiff arose within this judicial district and division.

56.     A judicial declaration is necessary and appropriate at this time, and Plaintiffs desire a judicial determination of their rights against Defendants, as they pertain to Plaintiffs' right to report information acquired through undercover investigation of political campaigns and politicians, without being subjected to threats, fines, litigation, prosecution or other harassment or intimidation by the State or its agents.

57.     In order to prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment be issued, pursuant to FED. R. CIV. P. 57, declaring unconstitutional the Defendants' policies and practices both on their face and as applied to Plaintiffs.

58.     Furthermore, pursuant to 28 U.S.C. § 2202 and FED. R. CIV. P. 65, it is appropriate and hereby requested that this Court issue preliminary and permanent injunctions prohibiting the Defendants from enforcing their restrictions on Plaintiffs' expressive activities to the extent they are unconstitutional, in order to prevent the ongoing violation of Plaintiffs' constitutional rights.

59.     Specifically, this Court should preliminarily and permanently enjoin Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the injunction, from engaging in any further official conduct that threatens, attempts to threaten, or actually interferes with Plaintiffs' protected expression, including but not limited to initiating or undertaking R.C. 3517.21(A)(1) enforcement actions against Plaintiffs and others.

## COUNT I
### VIOLATION OF RIGHT TO FREE SPEECH UNDER
### THE FIRST AND FOURTEENTH AMENDMENTS
### TO THE UNITED STATES CONSTITUTION AND SECTION 11, ARTICLE I OF THE OHIO
### CONSTITUTION
### (42 U.S.C. § 1983)

60.     Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

61.     The First Amendment to the United States Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

62.     Section 11 of Article I of the Ohio Constitution more broadly protects Plaintiffs' right to engage in undercover investigative reporting, providing as follows: "Freedom of Speech; of the press; of libels. Every Citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge that liberty of speech, or of the press. ***"

63.     "Generally speaking,  government action which chills constitutionally protected speech or expression contravenes the First Amendment," and "[t]he threat of sanctions may deter [the exercise of First Amendment freedoms] almost as potently as the actual application of sanctions." *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781, 794 (1988); *See Siggers-El v. Barlow,* 412 F.3d 693, 701 (6th Cir. 2005) (observing that because "there is no justification for harassing people for exercising their constitutional rights, [the deterrent effect] need not be great in order to be actionable").

64.     Threatened deprivation of constitutional rights that chills speech is a First Amendment harm. *United Food & Commercial Workers Local 1099 v. City of Sidney,* 364 F.3d 738 (6th Cir. 2004).

### *Plaintiffs' political speech is protected*

65.    The First Amendment to the United States Constitution and Section 11, Article I of the Ohio Constitution protect Plaintiffs' undercover journalism.

66.    Plaintiffs' investigative reporting on political campaigns is at the core of our electoral process and of the First Amendment freedoms – an area of public policy where protection of robust discussion is at its zenith.

67.    Political "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. FEC,* 130 S.Ct. 876, at 898 (2010), citing *Buckley v. Valeo*, 96 S.Ct. 612.

68.    The Supreme Court of the United States observes that "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley,* supra.

69.    "[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs . . . of course includ(ing) discussions of candidates." *Mills v. Alabama, 384 U.S. 214, 218 (1966).*

70.    "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley,* supra.

71.    "[I]t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

72.    "The very notion of a court interfering with the free flow of debate on matters of profound public concern is repugnant to our democratic way of life. We should never forget that an unfettered press is the custodian of all our liberties and the guarantor of our progress as a free society." *Varanese v. Gall*, 35

Ohio St.3d 78, 80 (1988), citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503–04(1984).

73.  "[I]nvestigative journalism has long been a fixture in the American press."  *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d. at 1189.  (D. Utah 2017).

74.  Government may not "suppress any unflattering coverage" or "suppress information from reaching the press by prosecuting newsgathering activities that serve as the foundation of investigative journalism." *Animal Legal Def. Fund v. Reynolds,* No. 417CV00362JEGHCA, 2019 WL 140069, at pp. 1–10 (S.D. Iowa Jan. 9, 2019).

75.  Newsgathering through "recording," especially with the intent to communicate or broadcast, is protected by the First Amendment.  *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 344, 94 S.Ct. 2997 (1974).

76.  The general creation and collection of information for the purpose of dissemination is protected by the First Amendment.

77.  The very thing hindered and suppressed by the Reporting Restriction - - Plaintiffs' practice of investigating politicians and their campaigns for the sole purpose of reporting political information - - constitutes protected expressive activity.

### *The Reporting Restriction Fails to Withstand Review*

78.  The State of Ohio has previously argued, and courts have recognized, that the purposes of the campaign regulations in R.C. 3517.21 are "to promote fair elections," maintain "the integrity of Ohio's election process,"  "preserve the integrity of its elections," "protect 'voters from confusion and undue influence,'" and 'ensur[e] that an individual's right to vote is not undermined by fraud in the election process."  *See McIntyre v. Ohio Elections Commission,* 514 U.S. at 349, 115 S.Ct. 1511 (1995); *Susan B. Anthony List v. Driehaus,* 814 F.3d 466, at 473 (2016); *Magda v. Ohio Elections Commission*, 58 N.E.3d 1188 (2016).

79.    With respect to R.C. 3517.21(A)(1), the Ohio Election Commission's Director has indicated that "it has always been my understanding that this statute is intended to prevent 'spies' from being placed on an opponent's committee." ***Exhibit D, Richter Email.***

80.    The Reporting Restriction transgresses the central principles underlying the First Amendment and Section 11, Article I of the Ohio Constitution because it (1) suppresses and hinders important political expression; (2) suppresses and hinders this political expression on the basis of its content and the identity of the speaker; and (3) is neither tailored nor the least restrictive means of hindering such expression.

81.    The Reporting Restriction hinders, suppresses, deters, and punishes newsgathering because it is *triggered by engagement in protected newsgathering with an intent to report.*

82.    The Reporting Restriction regulates on the basis of the content of what is reported and the identity of the speaker doing the reporting, and burdens core political speech.

83.    Both the Sixth Circuit and Ohio courts have already concluded that R.C. 3517.21 is content - based and burdens core political speech.

84.    Similarly to the other portions of R.C. 3517.21 that have recently been invalidated, the Reporting Restriction fails strict scrutiny (and intermediate scrutiny as well) because it (1) fails to advance any compelling, important, or legitimate governmental interest; (2) is neither a direct nor actually necessary means of achieving whatever the claimed governmental interest may be; (3) is neither the least restrictive nor a narrowly-tailored means of achieving any governmental interests; (4) is both an over-inclusive and under-inclusive means of achieving any governmental interest; and (5) fails to require falsity, malice, or damages before otherwise-protected speech is hindered, deterred, suppressed, and punished.

85.    The Reporting Restriction's purpose of protecting politicians, public officials, or campaigns from unwanted disclosure of information fails to amount to a compelling or even legitimate governmental interest.

86.     The Reporting Restriction deters and suppresses the publication of truthful and potentially-important political information by neutral intermediaries at the very time that the public may most benefit from that information.

87.     The Reporting Restriction *hinders* and *subverts* the governmental interests the State has previously claimed to support R.C. 3517.21.

88.     Federal district courts adjudicating analogous reporting restrictions routinely observe that there are less restrictive means than suppressing investigations pursuant to under-cover reporting, such as applying already-generally-applicable (but more tailored) tort and contract law. *Animal Legal Def. Fund v. Reynolds,* No. 417CV00362JEGHCA, 2019 WL 140069, at p. 1–10 (S.D. Iowa Jan. 9, 2019); *Animal Legal Def. Fund v. Wasden,* 878 F.3d 1184, at 1204-1205 (9th Cir. 2018)(citations omitted).

89.     Campaigns can sufficiently defend themselves from undercover investigative reporting of the type Plaintiffs participate in through counter-speech, i.e. by denouncing, disputing, or marginalizing objectionable investigative reports.

90.     Ohio already maintains statutory proscriptions against fraud, trespass, theft, and provides for common law claims for breach of contract, violation of duties owed through agency law, and defamation and libel.

91.     Campaigns can sufficiently defend themselves from undercover investigative reporting of the type Plaintiffs participate in through proscriptions against fraud, trespass, theft, through utilizing common law claims available through contract, agency law, or through defamation and libel.

92.     Despite less restrictive alternatives, the Reporting Restriction suppresses investigation and reporting even in situations where no statutory or contractual limit has been breached, even where no defamation or libel has taken place, even where "the opposition" is not doing the investigation, and even where disclosure would counter-balance potentially biased or false reporting.

14

93.     The Reporting Restriction's timing and screening procedures are not sufficiently tailored to advance any compelling or legitimate state interest, including those the state has previously identified when attempting to justify the validity of other Sections of R.C. 3517.21.

94.     The Reporting Restriction's timing provisions fail to advance any state interest in elections integrity due to the lengthy two-year statute of limitations.

95.     The Reporting Restriction's screening provisions fail to advance any state interest in a sufficiently restrained or tailored manner, because a probable cause hearing regarding an alleged violation of the Reporting Restriction can be triggered by *anyone*, including a rival with a vendetta.

96.     An entirely unaffected Washington D.C. political entity, Democracy Partners, filed the claim against PV regarding information it reported on the Clinton and Strickland campaigns because PV investigated Democracy Partners in the past, exposing its questionable practices and causing it embarrassment.  *See Exhibit B.*

97.     The Reporting Restriction claim was raised against PV *for the first time* in October of 2018, greater than *two full years* after the Strickland and Clinton campaigns (and political careers) ended.  *Id.*

98.     The Reporting Restriction applies to journalists working for a non-profit public charity, like PV, with no stake in the outcome of the election and without the legal capacity to spend to influence an election.

99.     The Reporting Restriction permits punishment even in cases where the information reported is immaterial, trivial, helpful to the public, or entirely truthful and accurate.

100.     The Reporting Restriction authorizes the punishment of reporting done without malice, falsity, defamation, or damage.

101.     Pursuant to the Reporting Restriction a journalist can be sanctioned even if the information reported is *entirely true, helpful to the public*, and *neither defamatory nor libelous*.

102.     Pursuant to the Reporting Restriction, a journalist can be sanctioned even if no actual identifiable damages are proven or even *alleged*.

103.     State proceedings were initiated against Plaintiffs pursuant to the Reporting Restriction despite the absence of any allegation that the Plaintiffs undercover investigative reporting was false.

104.     State proceedings were initiated against Plaintiffs pursuant to the Reporting Restriction despite the absence of any allegation that the Plaintiffs undercover investigative reporting was defamatory.

105.     State proceedings were initiated against Plaintiffs pursuant to the Reporting Restriction despite the absence of any allegation that the Plaintiffs' undercover investigative reporting inflicted tangible damage on the political campaigns at issue.

106.     The Reporting Restriction authorizes the State to *criminalize and prosecute* political expression that could not be sanctioned through *civil* causes of action such as defamation or libel, i.e. expression that is not to aid a political rival, not false, not fraudulent, and not malicious.

107.     Those who obtain approval of the candidate or candidate's organization may discover and report the exact same information without subjection to any Reporting Restriction penalty whatsoever.

108.     Whistleblowers remain free to investigate and report the same type of information while working *in government for an elected official who is subject to reelection*, even though doing so may hinder a future campaign for reelection.

109.     Only "candidates" and "elections campaign organizations" are "protected" by the Reporting Restriction.

110.     The Reporting Restriction impermissibly limits Plaintiffs' expression through conditioning it upon (1) obtaining express approval of what is to be reported from the campaign being investigated; or (2) foregoing undercover investigation as a means of obtaining the content to be reported.

111.     The State's maintenance of the Reporting Restriction has chilled Plaintiffs' protected expression with respect to political campaigns.

112.      The State's maintenance of the Reporting Restriction threatens to further silence Plaintiffs' protected expression with respect to political campaigns.

16

**COUNT II**
**VIOLATION OF RIGHT TO DUE PROCESS PURSUANT TO**
**THE FIRST AND FOURTEENTH AMENDMENTS**
**TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO**
**CONSTITUTION**
**(42 U.S.C. § 1983)**

113.      It is, by now, a "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

114.      A law "can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1311 (11th Cir. 2009) (stating that a law is unconstitutionally vague "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case").

115.      "[S]tandards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432 (1963).

116.      Vague laws force potential speakers to "'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked," thus silencing more speech than intended. *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316 (1964).

117.      Accordingly, "government may regulate in the area" of First Amendment freedoms "only with narrow specificity." *Button*, 371 U.S. at 433.

118.      "[T]he First Amendment does not permit laws that force speakers to retain a campaign finance attorney … before discussing the most salient points of our day" and "political speech must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United,* supra.

119.     The "use of unmoored terms," such as "political" and "designed to influence or impact voting," particularly in the face of "haphazard interpretations the State has provided," or no interpretation at all, are insufficiently precise.

120.     Chapter 3517 of the Ohio Revised Code fails to define "intent to affect the outcome", "campaign", "outcome", or "elections campaign organization."

121.     Requiring an "intent to affect the outcome of the campaign" fails to validate the Reporting Restriction because that phrase is both vague and arbitrary.

122.     The requirement of an "intent to affect the outcome of the campaign" is subject to multiple divergent meanings, some of which necessarily leave judges, juries, and commission members impermissibly broad discretion to determine what is to be penalized in any given case.

123.     The OEC acknowledges that the Reporting Restriction lack clarity and OEC members interpret the phrase in broad and arbitrary manners. ***See Exhibits D and E.***

124.     OEC Executive Director Phil Richter concedes "the Commission has not had the opportunity to offer any direction, advice or opinion on this area of law . . . to my knowledge, there has never been a statement by the Commission that further defines it . . . <u>presumably any type of work on a campaign could potentially invoke the 'intent' language.</u>" ***See Exhibit D (Emphasis added).***

125.     The Chairwoman of the OEC posited that any publication regarding a political issue within 60 days of an election (including Plaintiffs' YouTube Video about Governor Strickland here) would demonstrate sufficient "intent to affect the outcome of the campaign," arguing "30, 60 days prior to an election is a key time when people are paying attention . . . and that's when this was aired. <u>So I'm not clear on how you claim this wasn't with the intent to [a]ffect the outcome of a campaign? . . . [It's] clear that it's meant to [a]ffect the outcome of the election.</u> You didn't continue airing it afterwards, and you aired it in a very specific time frame right before the election. What other purpose would it be aired for?" ***See Exhibit E.***

126.     When engaging in undercover investigative reporting, Plaintiffs' intent is, with reckless indifference as to whether or not the "outcome of the campaign is affected," to showcase political dishonesty, hypocrisy, corruption, and veiled intentions and beliefs at a time when that demonstration is most likely to be noticed by the public.

127.     Time is of the essence, as Plaintiffs must begin planning Ohio-based investigations of several candidates who will be up for election in the March 2020 primaries and November 2020 general elections for President of the United States and Congress.

128.     Each day's chilling of speech magnifies the Reporting Restriction's burden on Plaintiffs' protected expression.

129.     In the absence of this Court's relief, Plaintiffs' undercover investigations within Ohio are futile, because they are prohibited from reporting to the public what they have learned during those investigations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Defendants, and that this Court:

(1)     Declare that R.C. 3517.21(A)(1) is unconstitutional on its face, unconstitutional as applied by Defendants, and unconstitutional as applied to Plaintiffs, insofar as it prohibits those disconnected from political campaigns from engaging in otherwise-legally-compliant undercover investigation and reporting on political campaigns without the approval of those same campaigns.

(2)     Issue a preliminary and permanent injunction prohibiting Defendants from enforcing R.C. 3517.21(A)(1) so as to prohibit the Plaintiffs and others disconnected from political campaigns from engaging in otherwise-legally-compliant undercover investigation and reporting on political campaigns without the approval of those same campaigns.

(3)     Assess against Defendants and award to Plaintiffs nominal damages as compensation for the deprivation of their clearly-protected constitutional rights.

(4)        Pursuant to 42 U.S.C. §1988 and other applicable law, award Plaintiffs their costs, damages, and

expenses incurred in bringing this action, including their reasonable attorneys' fees; *and*

(5)        Grant such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
122 E. Main Street
Columbus, Ohio 43215
Tel: (614) 340-9817
*MThompson@OhioConstitution.org*

Benjamin Barr (IL Bar # 6274521)(*Pro Hac Vice* pending)
Statecraft PLLC
444 N. Michigan Ave. #1200
Chicago, Illinois 60611
Tel: (202) 595-4671
*Ben@StatecraftLaw.com*

CURT C. HARTMAN
THE LAW FIRM OF CURT C. HARTMAN
7394 Ridgepoint Drive, Suite 8
Cincinnati, Ohio 45230
TEL: (513) 379-2923
*HartmanLawFirm@fuse.net*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following attorneys
within the offices of the Ohio Attorney General Dave Yost, via e-mail, on the date of filing:

Keith O'Korn, *Esq.*
*Keith.O'Korn@ohioattorneygeneral.gov*
Benjamin Flowers, *Esq.*
*Benjamin.Flowers@OhioAttorneyGeneral.gov*
Stephen Carney, Esq.
*Stephen.Carney@OhioAttorneyGeneral.gov*

Respectfully submitted,

/s/ *Maurice A. Thompson*
Maurice A. Thompson (0078548)

## **<u>VERIFICATION</u>**

Pursuant to 28 U.S.C. § 1746, I, Russell Verney, declare the following:

1.   I have reviewed the Complaint in this case.

2.  I have personal knowledge of the factual matters alleged in the Complaint because I am the Executive Director of both Project Veritas and Project Veritas Action Fund.

3.  The factual allegations contained herein are true and accurate.

   I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of July, 2019

 /s/ *Russell Verney*

Russell Verney
Executive Director
Project Veritas