# Exhibit A:  *Affidavit and Verifying Affidavit of PVA Executive Director Russell Verney*

## IN THE OHIO ELECTIONS COMMISSION

|  |  |
|---|---|
| **Lauren Windsor** | **Case No. 2018G-028** |
| **Complainant,** | |
| **-VS-** | |
| **Project Veritas Action Fund,** *et al.* | |
| **Respondents** | |

---

### AFFIDAVIT OF RUSSELL JOSEPH VERNEY

---

I, Russell Joseph Verney, being duly sworn upon my oath do hereby state the following to be true and accurate:

1) I have served as the Executive Director of Project Veritas Action Fund ("PVA") since 2014.

2) I submit this affidavit in support of PVA's combined answer and motion to dismiss. I am familiar with the claims raised by PVA. I am authorized to make this affidavit on behalf of PVA and I make these statements based on my personal knowledge or upon review of the information kept in the course of normal business operations at PVA. The facts set forth in this affidavit are true to my knowledge.

3) PVA is a non-profit organization that engages almost exclusively in undercover journalism. This involves the primary use of secret audio and video recording to report to the public about instances of corruption, fraud, waste, and abuse.

4) PVA has a well-established history of exposing corruption, fraud, waste, and abuse since its inception in 2014. Some notable projects include:

   a. In 2017, the Federal Election Commission entered into a conciliation agreement with the Bernie Sanders 2016 campaign and the Australian Labor Party. This agreement arose out of an investigation carried out by PVA that exposed illegal, foreign, in-kind contributions being accepted by the Sanders campaign. After the FEC investigated, the parties each agreed to pay $14,500 as a penalty to the Commission.

   b. During the 2016 presidential election, PVA infiltrated an organization called "Democracy Partners" and demonstrated evidence of collusion between non-profits and campaign committees. As a result, the head of Democracy Partners, Robert Creamer, resigned.

   c. During the recent 2018 midterm elections, PVA released several popular videos investigating candidates for public office and their campaigns. This included investigations in Arizona, Florida, Indiana, Missouri, and Texas.

5) PVA publishes its report with an intent to better educate the public about corruption, fraud, waste, and abuse in American life. Its most effective way to expose wrongdoing is by going undercover and revealing its findings.

6) PVA is not a political organization, does not take stances on controversial political topics, does not endorse, support, or oppose candidates for election, and spends its time, energy, and resources engaged in newsgathering and reporting. Because it focuses on public corruption, government wrongdoing, and the inner workings of political campaigns, it often reports on public servants and candidates for public office. In doing so, PVA's intent

is to uncover facts and report them, not sway voters for or against particular candidates or issues.

7) PVA published a video on October 5, 2016 that featured an investigation of the Ted Strickland political campaign. It has received over 20,000 views. One undercover journalist operated in the campaign before the Ohio primary on March 15, 2016. Another journalist investigated the campaign before the general election and the last contact that journalist had with the campaign was September 26, 2016. PVA had no journalists embedded in or investigating the Strickland campaign after September 26, 2016. PVA received the complaint in question about this investigation on October 9, 2018.

8) PVA's former journalist, Allison Maass, investigated Democracy Partners from September 21, 2016 to October 14, 2016 and was solely present in New York and Washington, DC.

9) Because of its video, the Ohio public was better educated about Strickland's positions on coal and firearms. PVA took no position about these issues and did not support or oppose Strickland's bid for election. PVA's intent was just to report the news.

10) PVA is injured by Ohio Revised Code 3517.21 since it prohibits journalists from reporting salient details back to press entities to share with the public. PVA plans to continue to investigate matters in Ohio and other states, including using undercover journalists in political campaigns, but fears the consequences of future attempted prosecutions were it to do so in Ohio.

By: _____                     Dated November 10, 2018
       Russell Verney


Sworn to or affirmed before me and subscribed in my presence the 10th day of November,

2018, in the state of Indiana and county of Hamilton.


By: _____
       Signature of Notary Public

JOHN HIMES
MY COMMISSION EXPIRES
February 2, 2025
SEAL
NOTARY PUBLIC - STATE OF INDIANA
MARION COUNTY

696272
02/02/2025

# Exhibit B:  *October 2018 OEC Complaint filed against Plaintiffs*



# Ohio Elections Commission

77 South High Street, Suite 1850
Columbus, Ohio 43215
614•466•3205
www.elc.ohio.gov

**Degee Wilhelm**
Chairman

**Catherine A. Cunningham**
Vice Chairman

**Helen E. Balcolm**

**Otto Beatty, III**

**Dennis Brommer**

**D. Michael Crites**

**A. Scott Norman**

**Philip C. Richter**
Executive Director

Fax: (614) 728-9408

October 2, 2018

Case No. 2018G-028
Windsor v. Project Veritas Action Fund, et al.

To: Project Veritas Action Fund, et al.

The Ohio Elections Commission has received a complaint alleging violations of election law pursuant to the Ohio Revised Code:

### §35517.21(A)(1)(Infiltration of Campaign)

This case has been scheduled for preliminary review at 10:00 A.M. on November 15, 2018, in Room East B located on the 31st floor of the Riffe Center at 77 S. High St., Columbus, Ohio 43215.

The Commission requests that you file a written response to the allegations as soon as possible explaining in full the reason(s) for the violation(s) or the basis for your belief contrary to the allegations. **The response must be properly notarized**. A proper notarization includes a statement above the notary public's signature that the document was **sworn to and subscribed in the presence of the notary public** and the date on which it was notarized. A statement of counsel would also be sufficient.

At the preliminary review, the Commission will review all timely filed documents submitted. After reviewing the documents, the Commission may do one of the following:

1. Find there has been no violation;
2. Find there has been a violation; or
3. Set the matter for a hearing at a later date if the Commission desires to receive further testimony.

Following the preliminary review, the commission will notify you of the disposition.

You are welcome to attend and observe the preliminary review, however, it is within the discretion of the Commission to allow any statements or presentation of any evidence at that time.

Sincerely,
Philip C. Richter
Executive Director

Lauren Windsor
1250 Eye St. NW Suite 330
Washington, DC 20005
202-628-7771
lauren@theundercurrent.tv

CASE NO. $20186$-$028$

September 26, 2018

EXHIBIT: $A$

Ohio Elections Commission
77 S. High St. Suite 1850
Columbus, OH 43215

**RECEIVED**

OCT 0 1 2018

To Whom It May Concern:

**OHIO ELECTIONS COMMISSION**

I am writing today to file complaint against Project Veritas Action Fund, James O'Keefe,
Allison Maass, and "Mike Foley" for at least two violations of Ohio elections law, as laid
forth below:

## Ohio Elections Commission Complaint

1. Name(s) of the person or party filing the complaint:

Lauren Windsor

2. Name(s) of the person or party against whom the allegations are being made;

Project Veritas Action Fund
James O'Keefe
"Laura" aka Allison Maass
"Mike Foley" – alias, identity unknown, picture in supplemental evidence

3. Address or addresses for all of the parties. This includes the person filing the
complaint as well as the parties against whom the complaint is filed. Also, please
include phone numbers, if they are available;

Lauren Windsor
1250 Eye Street NW Suite 330
Washington, DC 20005
(202) 628-7771

Project Veritas Action Fund
1214 West Boston Post Road
No. 156
Mamaroneck, New York 10543
(914) 908-2321

James O'Keefe
121 Goodwin Terrace
Westwood, NJ 07675-2938

Allison Maass
2000 N. Adams St. Apt 726
Arlington, VA 22201

"Mike Foley" – alias, identity unknown, picture in supplemental evidence

4. A written narrative or statement of the alleged violation or violations, specifically
   identifying the statement or statements which you allege to be false and an
   explanation of the personal knowledge of the complainant;

## Project Veritas Broke Ohio Elections Law

On October 5, 2016, Project Veritas Action Fund, led by notorious rightwing political
hitman James O'Keefe, published "

." The video features clips filmed surreptitiously by
different operatives within the Grove City, OH coordinated campaign office of the Ohio
Democratic Party for the Hillary Clinton and Ted Strickland campaigns, and within other
locations. The problem for James O'Keefe and company is that embedding agents
within political campaigns is illegal in the state of Ohio. The two-year statute of
limitations on these open claims will run out in the next couple of weeks.

According to                                                             :

(A) No person, during the course of any campaign for nomination or election to public

office or office of a political party, shall knowingly and with intent to affect the outcome

of such campaign do any of the following:

(1) Serve, or place another person to serve, as an agent or employee in the election

campaign organization of a candidate for the purpose of acting to impede the conduct of

the candidate's campaign for nomination or election or of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization...

Based on interviews and evidence provided by several ODP staffers, and evidence found within Project Veritas' own video publication, O'Keefe placed at least two people in the election campaign organizations of two candidates for the purpose of reporting information to him, without the knowledge of the candidates. O'Keefe's clear purpose was to use that information to harm those campaigns, as the video itself did not report on any criminal wrongdoing of staffers, but on their opinions of the viability of their candidate and on the candidate's stances on contentious issues.

More importantly, O'Keefe is a well-known political mercenary, with a long history of hyping "October surprises," opposition research dumps timed for maximum impact in the election cycle -- his being video releases targeting only Democrats and progressive organizations. According to a        report from earlier this year, "Project Veritas has made little effort to ever damage Republicans. The one example its leaders cite—a takedown of Wisconsin Senate President Mike Ellis—had the hallmarks of a contracted kill." Notably, the Ellis sting did not involve the infiltration of his campaign. Since the founding of his political advocacy arm, Project Veritas Action, in 2014, O'Keefe has only ever placed agents within the                                  , including those of Allison Lundergan Grimes, Mary Landrieu, Hillary Clinton, Ted Strickland, Deborah Ross, Russ Feingold, and Bernie Sanders. The infiltration of political campaigns by operatives is political espionage and is a serious threat to election integrity.

ODP staffer Priscilla Chau reached out to Veritas operative "Mike Foley," who was a volunteer in the campaign's VoteBuilder digital campaign system, via text on September 14, 2016, the day after he had participated in a phone banking session. For approximately the next two weeks, Foley worked under the supervision of Chau, and with Andy Dickson and Will Donahue in the Grove City, Ohio office. He made phone calls, and on at least one occasion, went out with Chau to register voters.

Project Veritas itself explicitly demonstrates the infiltration of the Ohio Democratic Party campaign office by its agents, within its own video. The first two clips explicitly take place during campaign work hours, within the campaign office, discussing candidate U.S. Senate candidate Ted Strickland. Both Chau and Dickson remember that Foley asked lots of questions about Strickland's views on the environment, though none of those exchanges were included in the published video, which focused on exchanges outside of the office, on whether Strickland supported banning coal. This was a particularly contentious issue in the mining state after Hillary Clinton infamously told a CNN town hall in Columbus that year, "We are going to put a lot of coal miners and coal companies out of business." It is not clear whether the operatives posing the questions on coal in the video were working for the campaign in any capacity.

Foley unsuccessfully employed a trademark Veritas tactic on multiple occasions with multiple people - luring campaign staffers into the discussion of potential voter fraud schemes. "Foley repeatedly asked me if he could register to vote in Ohio, even though he wasn't planning on staying in the state past December," Chau told me. "I repeatedly told him no."

The operative was also very persistent about socializing after hours with individual campaign staffers, Chau in particular. Multiple people described his behavior toward her as romantic, and in general, as weird. Foley last met with campaign staffers at a presidential debate watch party at Dickson's apartment on Sept. 26, 2016, and tried to convince them to go out afterwards to no avail. Said Donahue, "We all had the sense that he was up to something."

Text messages between ODP staffer Priscilla Chau and PV operative "Mike Foley" from Sept. 14-Oct. 3, 2016. See attachment for greater detail.

Dylan Fonner, who worked in Columbus during the 2016 primary for the Ohio Democratic Party and Ted Strickland, met a Project Veritas operative named "Laura" at a Strickland primary event. (In the general election period, he worked for Hillary for

America.) She was a volunteer, and had access to the ODP computer network and primary voter information. Fonner told me that Laura had said she was visiting Columbus from New York, and that they had a six-month long flirtation including hugging and hand holding. The use of romantic behavior to build intimacy with political targets is not a journalistic practice, but one of espionage.

And to what end? The clip of Fonner in the Veritas video does not show him committing any crime, nor is he acting unethically. Fonner said, "I don't think Rob Portman is a bad guy... If Rob Portman won, it won't be the end of the world." This is truly a hard-hitting exposé.

During our interview, Fonner identified Laura from several pictures provided to him as being former long-time Veritas operative                    , who currently works for the conservative media conglomerate Sinclair Broadcasting. Maass is named as a co-defendant in lawsuits against Project Veritas from Dianne Barrow, Kimberly Koerber, Steve Wentz, and my firm, Democracy Partners. In the 2016 cycle, she embedded within the Senate campaigns of Ted Strickland and Russ Feingold, and the presidential campaigns of Bernie Sanders and Hillary Clinton in multiple states.

Regardless of whether O'Keefe tries to argue a flimsy First Amendment justification, Ohio law explicitly prohibits information sharing by an agent reporting to a principal outside the campaign. At least two Project Veritas operatives clearly violated the letter of the law.

---

**Time Code Breakdown of Project Veritas' Strickland Video Clips**

00:04-00:08: James O'Keefe voiceover: "Ohio Democrat Ted Strickland's campaign for Senate is floundering. We heard it not from Republicans, but from Democrats working for his campaign."

00:13-00:28: Male PV journalist/campaign volunteer going by the alias "Mike Foley" talks to ODP staffer Andy Dickson **inside the Grove City, OH coordinated campaign office** about the prospects for Strickland to beat GOP opponent Rob Portman. Dickson says, "It's not looking good."

00:28-00:42: Male PV journalist/campaign volunteer going by the alias "Mike Foley" talks to ODP staffer Will Donahue (currently living in Chicago), **inside the Grove City, OH coordinated campaign office** about the Democratic Party pulling funds from the Strickland campaign.

00:43-00:50: James O'Keefe voiceover: "And interestingly, this lead organizer for Ohio Democrats and Hillary Clinton doesn't seem to have any serious problems with Strickland's Republican opponent, Rob Portman."

00:51-01:11: PV journalist/campaign volunteer talks to Dylan Fonner, then an organizer for ODP and Hillary for America inside a restaurant. It is not clear whether this discussion occurred during work hours. Clip of Fonner saying, "I don't think Rob Portman is a bad guy... If Rob Portman won, it won't be the end of the world."

01:11-01:15: James O'Keefe voiceover: "If Strickland is elected, it may be the end of Ohio's coal industry."

01:16-01:36: Female PV journalist talks to Ohio Senate candidate Ted Strickland about his position on coal, at a fundraiser in Washington, DC.

01:43-02:50: Male PV journalist talks to Ted Strickland's wife about his position on gun reform, location unknown.

02:50-04:02: Male PV journalist talks to Ted Strickland about his position on coal, location unknown.

04:02-05:11: Male PV journalist talks to Ted Strickland's communications director, David Bergstein, about Strickland's position on banning coal and guns entirely, location unknown.

05:12-05:19: Remaining two clips are replays of remarks from Strickland and his wife on coal and guns.

5. A reference to the section or sections of the Ohio Revised Code alleged to have been violated;

## Ohio Rev. Code Ann. § 3517.21(A)(1): Infiltration of Campaign

This statute prohibits "[s]erv[ing], or plac[ing] another person to serve as an agent or employee in the election campaign organization of a candidate for the purpose of acting to impede the conduct of the candidate's campaign for nomination or election or of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization." Ohio Rev. Code § 3517.21(A)(1).

6. The complaint must be based on personal knowledge, originally signed and properly notarized. A proper notarization includes the phrase "signed and sworn before a Notary Public";

Several of the video clips within campaign offices are "personal knowledge" for anyone viewing the video. The names, dates, and locations were provided to journalist Lauren Windsor in the article "Project Veritas Broke Ohio Elections Law," from witnesses Andy Dickson, Will Donahue, Priscilla Chau, and Dylan Fonner.

7. Any additional materials or exhibits may be included to support the allegations contained in the complaint.

A. VIDEO:
   "UNDERCOVER: O'Keefe Exposes Ted Strickland's True Positions on Coal and Guns"

B. ARTICLE:
   Project Veritas Broke Ohio Elections Law

# Exhibit C:  *January 8, 2019 Order of the OEC*



**Ohio Elections Commission**
77 South High Street, Suite 1850
Columbus, Ohio 43215
614•466•3205
www.elc.ohio.gov

Degee Wilhelm
Chairman

Catherine A. Cunningham
Vice Chairman

Helen E. Balcolm

Otto Beatty, III

Dennis Brommer

D. Michael Crites

A. Scott Norman

Philip C. Richter
Executive Director

Fax: (614) 728-9408

## ORDER OF THE OHIO ELECTIONS COMMISSION

Re: Case No. 2018G-028
Windsor v. Project Veritas Action Fund, et al.

PROJECT VERITAS ACTION FUND
1214 W. BOSTON POST RD. NO 156
MAMARONECK, NY 10543

On 11/15/2018 after careful consideration of the evidence, the Ohio Elections Commission adopted the following finding(s) in the above referenced matter:

THE COMMISSION DISMISSED THE MATTER AS THE COMPLAINT WAS NOT FILED WITHIN THE COMMISSION'S 2-YEAR STATUTE OF LIMITATIONS. THE COMMISSION THEN DENIED THE REQUEST TO FIND THE MATTER FRIVOLOUS.

If the decision in this case involves the imposition of a specific fine amount, payment of the fine must be made no later than 30 days after the date of this letter. Payment should be made payable and sent to the Ohio Elections Commission Fund at the above address. Unpaid fines will be sent to the Ohio Attorney General for collection.

If the disposition of this case involves a daily fine amount, you must contact the office in which you file your campaign finance reports and file the report. In addition, to have the daily fine reconsidered, you must file a notarized statement with the Commission. The filings and affidavit must be received within 30 days after the date of this letter. All properly notarized affidavits must include a statement above the notary public's signature that the document was "**sworn to and signed**" in the presence of the notary public and the date on which it was done.

If the decision in this case does not involve the imposition of a fine, there is no further action required of you by the Commission.

**Not all decisions of the Commission are appealable. However, if the decision in this case is appealable, and <u>adverse</u> to your interests under the law, this case <u>may</u> be appealed pursuant to Ohio Revised Code §119.12. Within <u>15</u> days after the <u>mailing</u> of this Order, a Notice of Appeal must be filed with the Commission as well as at the Clerk's office for the Franklin County Court of Common Pleas.**

In all cases, please use the OEC case no. listed at the top of this letter when corresponding with the Commission. If you have any questions, please feel free to contact the Commission staff at (614) 466-3205.

It is hereby certified that the foregoing is a true and exact reproduction of the original Order of the Ohio Elections Commission for this case as entered on its journal.

BY ORDER OF THE OHIO ELECTIONS COMMISSION

Philip C. Richter, Executive Director and Staff Attorney
ORDER MAILED & EFFECTIVE: January 8, 2019

# Exhibit D: *Correspondence from OEC Director Phil Richter*

**mthompson@ohioconstitution.org**

| | |
|---|---|
| **From:** | Philip.Richter@elc.state.oh.us |
| **Sent:** | Thursday, March 14, 2019 5:02 PM |
| **To:** | mthompson@ohioconstitution.org |
| **Subject:** | RE: Quick Question on OEC and R.C. 3517.21(A)(1) |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Mr. Thompson:

I can appreciate your, and your client's, concern. Unfortunately, I don't have a lot of additional information to provide.

The Commission will have a complaint filed with it alleging a violation of R.C. §3517.21(A)(1) only rarely, and during my time in working with the Commission there has never been a complaint that viably asserted a violation of this section. Thus, the Commission has not had the opportunity to offer any direction, advice or opinion on the nature of this area of law. In my opinion and at initial review, this case was probably the closest case that has ever been presented to the Commission in terms of properly invoking the jurisdiction of the Commission, based only on my review of the complaint (i.e. not considering any response). Once the response was received and considered, it became apparent that there was no intent to violate the law.

To me, a case brought under the provision of this Statute would be very difficult to establish ... difficult, I guess, but not impossible. The key element to me is not as much the 'intent to affect the outcome' that you reference but more the provision that states "for the purpose of acting to impede the conduct of the candidate's campaign ... or of reporting information to the employee's employer or the agent's principal". Certainly the portion of the statute you reference is also a critical phrase (and no, to my knowledge, there has never been a statement by the Commission that further defines it), but it has always been my understanding that this statute is intended to prevent 'spies' from being placed on an opponent's committee and so that is why I think it harder to establish that the other portion of the statute has been activated\violated than affecting an election because presumably any type of work on a campaign could potentially invoke the 'intent' language.

Additionally, if you can identify a case that has either invoked this provision or gives additional definition on the phrase you reference, I'd appreciate you giving me a 'heads up' on the case because I am not aware of any other matter that has touched on the subject.

If you want to discuss this further, please don't hesitate to give me a call. I would prefer further conversation rather than seeing your client have to come before the Commission again. Please let me know if there is anything else you need from me.

Lastly, just for your information, below is my recommendation outline that I provided to Commission member at the meeting. Not being sure if you had it, I thought it might be helpful.

All the best.

Philip C. Richter, Esq.
Executive Director\Staff Attorney
Ohio Elections Commission

1

## Windsor v. Project Veritas Action Fund, et al.................................... 2018G-028

| | |
|---|---|
| Allegations: | Complainant alleges that the respondents improperly placed a person or persons on the campaign committee of U.S. Senate candidate, Ted Strickland in violation of R. C. §3517.21(A). |

Statute: (A) No person, during the course of any campaign for nomination or election to public office or office of a political party, shall knowingly and with intent to affect the outcome of such campaign do any of the following:

(1) Serve, or place another person to serve, as an agent or employee in the election campaign organization of a candidate for the purpose of acting to impede the conduct of the candidate's campaign for nomination or election or of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization;

| Penalty: | R.C. §3517.155(A)(1) | Find no violation |
|---|---|---|
| | R.C. §3517.155(A)(1)(a) | Find good cause not to impose a fine or refer the matter for prosecution |
| | R.C. §3517.155(A)(1)(c) | Refer for prosecution |
| | R.C. §3517.992(A) | Impose fine of up to $5000 |

Response: An in-depth response was submitted that asserts a number of defenses that include the fact that there was not proper personal knowledge by the complainant, that the complaint should be time-barred as the activities all occurred prior to the date that the complaint was filed and that the statute in question is unconstitutional.

Recommendation: Dismiss. The complaint is either not filed within the 2-year statute of limitations contained in R.C. §3517.157 or was not based on sufficient personal knowledge. [I would also recommend that the complaint not be found frivolous and no costs awarded to respondent.]

---

**From:** mthompson@ohioconstitution.org [mailto:mthompson@ohioconstitution.org]
**Sent:** Wednesday, March 13, 2019 4:17 PM
**To:** Richter, Philip <Philip.Richter@elc.state.oh.us>
**Subject:** Quick Question on OEC and R.C. 3517.21(A)(1)

Hi Phil,

Hope you're well. I'd appreciate any thoughts you have on the following:

We recently ordered the Transcript from a November OEC hearing for our client, Project Veritas (Case No. 2018-G28).

This hearing concerned R.C. 3517.21(A)(1), which I doubt you otherwise see very much.

Project Veritas wants to keep doing the type of work they do in Ohio - - under-cover investigation and reporting on politicians. But they're definitely concerned about the breadth of the statute, especially given that they only won the hearing on statute of limitations grounds rather than on the merits, and that the transcript does feature several OEC commissioners indicating that their method of operation may well violate the statute.

R.C. 3517.21(A)(1) does limit the reach of the statute to only those who have "intent to affect the outcome of such campaign".

But I cannot find definitions for this phrase or these words, there do not appear to be any reported cases on the statute at all, and I can't find anything in the OAC or any OEC advisory opinions on this.

Does the OEC have any position on the meaning of this phrase; or do you have any other input on its scope?

Thanks for your time.

*Maurice A. Thompson*
*Executive Director*
*1851 Center for Constitutional Law*
*122 E. Main Street*
*Columbus, Ohio 43215*
*Tel: (614) 340-9817*
*www.OhioConstitution.org*

# Exhibit E: *Partial Transcript of OEC Proceedings Illustrating Vagueness*

1

BEFORE THE OHIO ELECTIONS COMMISSION

– – – – –

IN THE MATTER OF:                          .

WINDSOR                                    .    CASE NO. 2018G-028

v.                                         .

PROJECT VERITAS ACTION FUND,.
et al.                                     .

. . . . . . . . . . . . . .

– – – – –

PROCEEDINGS

before Chairwoman Degee Wilhelm, and Commission Members
Catherine A. Cunningham, D. Michael Crites, Otto Beatty
III, Scott Norman, Dennis Brommer at the Vern Riffe
Center for the Arts, 31st Floor, Room East B, Columbus,
Ohio 43215, called at 10:21 a.m. on Thursday, November
15, 2018.

DAVIS DEPOSITIONS, LLC
175 SOUTH THIRD STREET, SUITE 200
COLUMBUS, OHIO 43215
(614) 407 – 9337

– – – – –

Sheet 11 Page 38

38

1  have newsgathering in America.
2          This law has striking consequences, involves
3  six months of potential criminal imprisonment as well
4  as hefty fines. It deters protected newsgathering. So
5  I would ask that a criminal dismissal be awarded and
6  attorney's fees as well. Thank you, members of the
7  Commission.
8          CHAIRWOMAN WILHELM: I have a question for Mr.
9  Barr. How do you get around the second half of that,
10 of 3517.21(A)(1), where it says, "or reporting
11 information to the employees, employer, or the agent's
12 principal without the knowledge of the candidate, or
13 the candidate's organization?
14         MR. BARR: The first half of the statute has
15 the preliminary threshold; that is, there has to be an
16 attempt to influence an election. You have to get past
17 that to be able to get to the next two triggers. If
18 there's no attempt to influence an election, then the
19 statute doesn't apply and the Ohio Elections Commission
20 doesn't have proper jurisdiction over the matter.
21         So you can imagine in the area of, say, of
22 tortious interference, one soap competitor against
23 another soap competitor, the law applies. But if
24 Veritas goes in to report on what a soap company is
25 doing, an unethical treatment of animals, for example,

Page 39

39

1  like the feline case from years back, that tort
2  wouldn't apply.
3          Here, we don't have a political actor that's
4  invading another political actor. This wasn't the
5  opposing political campaign. It wasn't a Super PAC.
6  It wasn't a political committee that was registered in
7  Ohio. It was a news organization so --
8          CHAIRWOMAN WILHELM: Well, you yourself have
9  argued that 30, 60 days prior to an election is a key
10 time when people are paying attention.
11         MR. BARR: Correct.
12         CHAIRWOMAN WILHELM: And that's when this was
13 aired. So I'm not clear on how you claim this wasn't
14 with intent to effect the outcome of a campaign?
15         MR. BARR: Because the intent to outcome in a
16 campaign would be shown by the fact that it didn't, you
17 know, Veritas didn't work with any political campaigns
18 --
19         CHAIRWOMAN WILHELM: Did you air it after the
20 election?
21         MR. BARR: No. No, it was aired on October
22 5th, 2016.
23         CHAIRWOMAN WILHELM: Well, then --
24         MR. BARR: That's when people in Ohio care
25 about --

Page 40

40

1          CHAIRWOMAN WILHELM: -- clear that it's meant
2  to effect the outcome of the election. You didn't
3  continue airing it afterwards, and you aired in it a
4  very specific time frame right before the election.
5  What other purpose would it be aired for?
6          MR. BARR: To inform and educate the public,
7  as we are allowed to in the First Amendment.
8          CHAIRWOMAN WILHELM: Thank you.
9          Any other questions? Discussion?
10         COMMISSIONER NORMAN: Well, it seems to me the
11 first hurdle you got to get back to is: Did they
12 actually file this within the appropriate statute of
13 limitations?
14         Because if they haven't done that, then all
15 the other arguments we're hearing seems to go away.
16         CHAIRWOMAN WILHELM: I agree with that.
17         COMMISSIONER NORMAN: And if we're talking
18 about the act of the commission as opposed to the
19 publication, I think it's the appropriate time frame;
20 that seems to me that the complaint was not timely
21 filed, because it all had ended by September 26th. The
22 complaint wasn't filed until October 1st.
23         CHAIRWOMAN WILHELM: I ask you because I know
24 the two of you are trial attorneys, as well as Mr.
25 Crites, is there -- I mean, they weren't on notice

Page 41

41

1  until the publication.
2          COMMISSIONER NORMAN: Well, they were clearly
3  -- they were aware of the last interaction with any of
4  these campaigns September 26th. They knew that. And
5  then the publication came out, but then they didn't
6  file a complaint based upon the last interaction. They
7  filed it based on the actual airing of the YouTube
8  video.
9          CHAIRWOMAN WILHELM: But did they know on the
10 26th, that they'd been infiltrated? Or did they know
11 after they saw something?
12         COMMISSIONER NORMAN: I think that's the last
13 time the act of commission was committed. It's not the
14 publication of the video; it's the actual commission of
15 infiltrating and being a part of the organization.
16         CHAIRWOMAN WILHELM: So are you saying if they
17 didn't find out until two years later plus one day,
18 they would have no case?
19         COMMISSIONER CUNNINGHAM: How would it be
20 influencing an election, if that were true?
21         CHAIRWOMAN WILHELM: Well, this is just for
22 argument's sake: What would you say regarding the
23 statute of limitations?
24         COMMISSIONER NORMAN: If they had no knowledge
25 -- if nothing happens during that two-year period, then