# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**PROJECT VERITAS, *et al.*,**

       **Plaintiffs,**

      **v.**

**OHIO ELECTION COMMISSION, *et al.*,**

       **Defendants.**

      **Case No. 2:19-cv-3130**
      **JUDGE EDMUND A. SARGUS, JR.**
      **Magistrate Judge Chelsey M. Vascura**

## <u>OPINION & ORDER</u>

This matter is before the Court for consideration of Plaintiffs' Motion for Preliminary Injunction (ECF No. 5), which alleges that Ohio Revised Code § 3517.21(A)(1) violates Plaintiffs' First Amendment rights. The Court held oral argument on Plaintiffs' Motion for Preliminary Injunction, which is now ripe for review. For the reasons that follow, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction.

## I.  <u>BACKGROUND FACTS</u>

### a.  <u>Ohio Revised Code § 3517.21(A)(1)</u>

Ohio Revised Code § 3517.21(A)(1) provides:

> (A) No person, during the course of any campaign for nomination or election to public office or office of a political party, shall knowingly and with intent to affect the outcome of such campaign do any of the following:
>
> > (1) Serve, or place another person to serve, as an agent or employee in the election campaign organization of a candidate for the purpose of acting to impede the conduct of the candidate's campaign for nomination or election or of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization;

Violation of this provision is a first-degree misdemeanor punishable by up to six months imprisonment, a $5,000 fine, or both. Ohio Rev. Code §§ 3599.40, 3517.992(V). Before a prosecution may commence under the statute, however, a complaint must be filed with the Ohio Election Commission ("the Commission") and all administrative proceedings must be completed. Ohio Rev. Code §§ 3517.21(C), 3517.153(C). Established in 1974 and reformulated in 1995, the Commission is an independent agency consisting of seven members, six of whom are appointed by the governor on the recommendation of the combined state House and Senate caucuses of the major political parties. Three members are appointed from each of the two major political parties and the seventh is an unaffiliated elector appointed by the other six members. All members serve five-year terms. *See* Ohio Elections Commission History, *available at* http://elc.ohio.gov/History.stm (last visited November 15, 2019).

"Any person" may file a complaint with the Commission, by affidavit and made on personal knowledge and subject to the penalties for perjury, alleging a violation of the statute. Ohio Rev. Code § 3517.153(A). The secretary of state or an official at the board of elections may also file a complaint. *Id*.

Once a complaint is filed, the Commission proceeds with a statutory hearing procedure set forth in Ohio Revised Code § 3517.154 to § 3517.157. Ohio Rev. Code §§ 3517.21(C), 3517.153(C). If a complaint is filed within 60 days of a primary election or within 90 days of a general election, the Commission will hold an "expedited" probable cause hearing within two business days of determining such a hearing is necessary. Ohio Rev. Code §§ 3517.154(A)(2)(b), 3517.156(B)(1). A three-member panel decides whether there is probable cause to believe that "the failure to comply with or the violation of a law alleged in the complaint has occurred." Ohio Rev. Code § 3517.156(A), (C). If so, the panel must refer the case to the full Commission for an

adjudicatory hearing to be held within ten days after the referral. Ohio Rev. Code § 3517.156(C)(2).

If an expedited hearing is not required, the Commission will hold a preliminary review hearing on the complaint, either by a probable cause panel or the full Commission. Ohio Admin. Code § 3517-1-11(A); (*see also* ECF No. 14-1, Richter Aff. ¶¶ 6-7.) The parties may submit briefs before the hearing and appear at the hearing to make arguments to the Commission, but are not required to do either. (*Id.* at ¶ 6). The Commission will not hear arguments, receive evidence, or take testimony unless the parties have stipulated to do so and a majority of the Commission members agree, or if any member wishes to request specific information that will aid in the proper determination of the matter at that stage. Ohio Admin. Code § 3517-1-11(A)(1). At this preliminary review stage, the body hearing the case reviews the pleadings, evidence, and motions before it in order to determine jurisdiction, sufficiency of the complaint, and whether probable cause exists for the full Commission to determine whether a violation has occurred. Ohio Admin. Code § 3517-1-11(A). If the review is held before a probable cause panel, the panel may dismiss the complaint or find sufficient probable cause exists that a violation occurred and recommend the Commission impose a penalty, refer the matter for prosecution, or find good cause exists to not impose a fine or refer the matter for prosecution. *Id.* If the preliminary review is before the full Commission, the Commission may take several actions, including setting the matter for a full hearing or making a final disposition by dismissing the case, imposing a penalty, referring the matter for prosecution, or finding good cause exists to not impose a fine or refer the matter for prosecution. *Id.*

The statute authorizes the full Commission to subpoena witnesses and compel production of documents. Ohio Rev. Code § 3517.153(B). At the full adjudicatory hearing, the parties may

3

present evidence and make opening and closing statements. Ohio Admin. Code § 3517-1-11(B)(2)(c), (d), (g). Within 30 days of the close of all the evidence, the Commission must determine whether a violation has occurred and do one of the following: refer the matter to the appropriate prosecutor, impose a fine, or find good cause exists to not impose a fine or refer the matter for prosecution. Ohio Rev. Code § 3517.155(A)(1), (C); *see also* Ohio Admin. Code § 3517-1-14(C). If the Commission decides not to impose a fine or refer the matter to a prosecutor, the Commission may still issue a public reprimand. *See* Ohio Admin. Code § 3517-1-14(D). Any finding of a violation of Ohio Revised § 3517.21(A) must be "by clear and convincing evidence." Ohio Rev. Code § 3517.155(D)(1). Any non-expedited adjudicatory hearing shall be held within 90 business days of the complaint being filed, unless the Commission finds there is good cause to hold a hearing after that time, in which case it will be held within 180 business days. Ohio Rev. Code § 3517.155(A)(1). If after dismissing a complaint the Commission determines the complaint is frivolous, the Commission shall order the complainant to pay reasonable attorney's fees and costs. Ohio Rev. Code § 3517.155(E). A party adversely affected by a final determination by the Commission may appeal to state court under Ohio Revised Code § 119.12. Ohio Rev. Code § 3517.157(D).

### b. Project Veritas

Plaintiff Project Veritas Action Fund ("PVA") is a non-profit organization that engages in undercover journalism to report to the public about corruption, fraud, waste, and abuse. (Amend. Compl., ECF No. 4 at ¶ 5.) PVA "is not a political organization, does not take stances on controversial political topics, does not endorse, support, or oppose candidates for election, and spends its time, energy, and resources engaged in newsgathering and reporting." (*Id.* at ¶ 7.) PVA reports on public servants and candidates for public office. (*Id.* at ¶ 8.) Plaintiff Project Veritas

("PV") is a 501(c)(3) tax-exempt public charity that "investigate[s] and expose[s] corruption, dishonesty, self-dealing, waste, fraud, and other misconduct in both public and private institutions" by launching investigations through placement of its undercover journalists "followed by a rollout of facts displaying corruption." (*Id.* at ¶¶ 9-13.) PV reports on candidates and campaigns, but does not engage in activities or speech that urge the election or defeat of any candidate. (*Id.* at ¶ 14.) Plaintiff James O'Keefe is the founder and President of both PV and PVA. (*Id.* at ¶ 15.)

On October 1, 2018, a complaint was filed with the Commission by Ms. Lauren Windsor against PVA, James O'Keefe, and others. (*Id.* at ¶ 36.) Ms. Windsor's complaint alleged that PVA and the other named respondents violated Ohio Revised Code § 3517.21(A)(1) based on events that occurred during the 2016 election cycle. (*Id.* at ¶ 37) (citing Ex. B, ECF No. 1-1 at PAGEID#27-35.) That complaint alleged that PVA, led by Mr. O'Keefe, published a video that "feature[d] clips filmed surreptitiously by different operatives within the Grove City, OH coordinated campaign office of the Ohio Democratic Party for the Hillary Clinton and Ted Strickland campaigns, and within other locations." (Ex. B, ECF No. 1-1 at PAGEID#30.) Specifically, Ms. Windsor's complaint alleged that Mr. O'Keefe "placed at least two people in the election campaign organizations of two candidates for the purpose of reporting information to him, without the knowledge of the candidates." (*Id.* at PAGEID#31.) These two "operatives" allegedly infiltrated the coordinated campaign office of the Ohio Democratic Party for the Hillary Clinton and Ted Strickland campaigns as "volunteers" and recorded conversations with other campaign workers. (*Id.* at PAGEID#31-33.) According to Ms. Windsor's complaint, PVA, led by Mr. O'Keefe, then published a video in October 2016 that featured clips "filmed surreptitiously" by these two individuals. (*Id.*)

The day after Ms. Windsor's complaint was received, the Commission scheduled a preliminary review to be held on November 15, 2018. (*Id.* at PAGEID#28.) The letter setting the preliminary review requested a written response, either notarized or made by counsel. (*Id.*) The letter stated that at the preliminary review, the Commission would review all timely filed documents submitted and could do any of the following: 1) find there was no violation; 2) find there was a violation; or 3) set the matter for a hearing at a later date if the Commission desired to receive further testimony. (*Id.*) The letter further stated that the respondents were welcome to attend and observe the preliminary review, but that it was within the Commission's discretion to allow any statements or presentation of evidence. (*Id.*) Plaintiffs attended the November 15, 2018 hearing through counsel. (Amend. Compl., ECF No. 4 at ¶ 41.) On January 8, 2019, the Commission dismissed the complaint as barred by the two-year statute of limitations, but declined to find the matter "frivolous." (Ex. C, ECF No. 1-1 at PAGEID#37.)

Plaintiffs claim that since the Commission's dismissal of Ms. Windsor's complaint, they have refrained from engaging in further investigative reporting in Ohio in response to the risk of such litigation and sanctions. (Amend. Compl., ECF No. 4 at ¶ 43.) Plaintiffs claim that the State of Ohio is "the location of significant political campaign activity" and that they "anticipate significant ongoing campaign activity by state and federal campaigns and candidates beginning in the fall of 2019, leading up to the March 10, 2020 primary elections, and then through the November 3, 2020 general elections and beyond." (*Id.* at ¶ 44.) Plaintiffs contend that they still "plan[] to investigate, within Ohio, several candidates and election campaign organizations that are either headquartered in Ohio or will be active within Ohio from October 1, 2019 through November 1, 2020 and beyond." (*Id.* at ¶ 45.)

Specifically, Plaintiffs "plan to investigate and report on instances of candidates for President of the United States, United States Congress, and the Ohio Statehouse publicly proclaiming positions that differ from their actual intentions on issues that are important to Ohioans[.]" (*Id.* at ¶ 46.) Plaintiffs "plan to accomplish the foregoing investigations by secretly investigating and recording, in public places, interactions of and between campaign staffers or candidates" and that they "plan to investigate, record, and report the foregoing in a manner substantially similar to the methods they used to investigate, record, and report on the Strickland campaigns in Ohio in 2016." (*Id.* at ¶¶ 47-48.) Plaintiffs claim that they will need to "alter or eliminate" these plans if Ohio Revised Code § 3517.21(A)(1) remains in effect because it "essentially criminalizes Project Veritas' proven and most effective practices." (*Id.* at ¶ 50.) They claim that but for this statute, they would undertake further investigative reporting. (*Id.* at ¶ 52.) But if that investigative reporting is pursued in Ohio, Plaintiffs claim their methods would subject them to civil and criminal liability because these methods "necessarily require the service of a Veritas reporter, during a political campaign, within the campaign of a candidate for public office for the purpose of reporting unapproved facts without that candidate or campaign's knowledge." (*Id.* at ¶ 51.)

### c. Procedural History

Plaintiffs initiated this action by filing a Complaint on July 19, 2019, (ECF No. 1), and subsequently filed an Amended Complaint on July 22, 2019. (ECF No. 4). Defendants are members of the Commission, sued in their official capacities.[1] (*Id.* at ¶ 21.) Plaintiffs bring this action under 42 U.S.C. § 1983, claiming Ohio Revised Code § 3517.21(A)(1) violates their right to free speech under the First and Fourteenth Amendments of the United States Constitution and

---

[1] Plaintiffs originally named the Commission as a Defendant, but the parties have since stipulated to the Commission's dismissal. (ECF No. 18.)

under Section 11, Article I of the Ohio Constitution and violates their right to due process under the First and Fourteenth Amendments of the United States Constitution and under Section 11, Article I of the Ohio Constitution. Plaintiffs request a declaration that Ohio Revised Code § 3517.21(A)(1) is "unconstitutional on its face, unconstitutional as applied by Defendants, and unconstitutional as applied to Plaintiffs, insofar as it prohibits those disconnected from political campaigns from engaging in otherwise-legally-compliant undercover investigation and reporting on political campaigns without the approval of those same campaigns." (ECF No. 4, PAGEID#67.)

On July 22, 2019, Plaintiffs moved for a preliminary injunction based on their First Amendment claim, requesting Defendants be enjoined from enforcing Ohio Revised Code § 3517.21(A)(1) "against Plaintiffs and others similarly situated, insofar as that Division prohibits undercover investigation of and reporting on political campaign[s]." (ECF No. 5 at PAGEID#100.) Plaintiffs request the statute "be enjoined prior to the beginning of the 2020 elections in December of 2019." (ECF No. 23 at PAGEID#180.) Defendants oppose the motion. (ECF No. 14.) Oral argument was held on October 1, 2019, and the motion is now ripe for review.

## II.  SCOPE OF THE CHALLENGE

At the outset, it is necessary to determine whether Plaintiffs are challenging the statute on its face or as-applied. "A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications, to take the law off the books completely." *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013) (internal quotation marks omitted). An as-applied challenge, however, "argues that a law is unconstitutional as enforced against the plaintiffs before the court." *Speet*, 726 F.3d at 872. "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election*

*Comm'n*, 558 U.S. 310, 331 (2010). "In fact, a claim can have characteristics of as-applied and facial challenges: it can challenge more than just the plaintiff's particular case without seeking to strike the law in all its applications." *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015) (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010)). The Supreme Court has said that it does not matter whether a challenge has been labeled as "facial" or "as-applied." *John Doe No. 1*, 561 U.S. at 194. Instead, the "important point" is whether Plaintiffs' "claim[s] and the relief that would follow...reach beyond the particular circumstances of these plaintiffs." *Id.* (citing *United States v. Stevens*, 559 U.S. 460, 472-473 (2010)). "In constitutional challenges reaching beyond the plaintiff's circumstances, the plaintiff must satisfy the 'standards for a facial challenge to the extent of that reach.'" *Green Party of Tenn.*, 791 F.3d at 692 (quoting *John Doe No. 1*, 561 U.S.at 194).

Plaintiffs ask this Court to declare the statute "unconstitutional on its face, unconstitutional as applied by Defendants, and unconstitutional as applied to Plaintiffs, insofar as it prohibits those disconnected from political campaigns from engaging in otherwise-legally compliant undercover investigation and reporting on political campaigns without the approval of those same campaigns." (Amend. Compl., ECF No. 4 at PAGEID#67.) Their motion for a preliminary injunction requests Defendants be enjoined from enforcing the statute "against Plaintiffs and others similarly situated, insofar as that Division prohibits undercover investigation of and reporting on political campaign[s]." (ECF No. 5 at PAGEID#100; *see also* ECF No. 23 at PAGEID#208.)

At oral argument, Plaintiffs argued that Defendants must be enjoined from relying on the statute to punish the gathering and reporting of information when: 1) the newsgatherer is not working for the opposing campaign; 2) the newsgatherer intends to or actually reports the information to the public rather than the opposing campaign; 3) the information reported to the

public is truthful; 4) the information reported to the public is one of public affairs, public concern, or public importance; 5) no generally applicable tort law, contract law, or statute has been violated when acquiring or reporting information.

The relief Plaintiffs seek, as set forth in their briefing and at oral argument, reaches beyond Plaintiffs' particular circumstances. Plaintiffs do not seek an injunction against enforcement of the statute against just them, and, notably, there is no pending enforcement of the statute against Plaintiffs before this Court. Instead, Plaintiffs request injunctive relief on behalf of Plaintiffs and "others similarly situated" who engage in undercover investigation and reporting on political campaigns. (ECF No. 5 at PAGEID#100; *see also* ECF No. 23 at PAGEID#208.) While Plaintiffs seek to narrow their facial challenge through the five factors articulated at oral argument, the challenge still extends beyond the particular circumstances of PV, PVA, and Mr. O'Keefe. Therefore, "Plaintiffs' claim is 'facial' in that it is not limited to Plaintiffs' particular case, but instead challenges application of the law more broadly" to those who engage in undercover investigation and reporting on political campaigns. *See Platt v. Bd. of Comm'rs on Grievances*, No. 1:13CV435, 2017 WL 1177576, at \*5 (S.D. Ohio Mar. 30, 2017), *aff'd sub nom. Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235 (6th Cir. 2018).

## III.   STANDING

Though Defendants did not raise the issue of Plaintiffs' standing in their motion papers, they did so at oral argument. Article III standing is a threshold jurisdictional question that must be addressed in every case. *Miller v. City of Cincinnati*, 622 F.3d 524, 531 (6th Cir. 2010). To establish Article III standing, a plaintiff must show: 1) an injury in fact; 2) a sufficient casual connected between the injury and the conduct complained of; and 3) a likelihood that the injury

will be redressed by a favorable decision. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

"An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or 'hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560) (some internal quotations omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

When an individual is threatened with enforcement of a law, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law. *Id.* at 158. The Supreme Court instead permits "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Id.* at 159. The Supreme Court has held "that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

In *Susan B. Anthony List v. Driehaus*, the Supreme Court held that the plaintiffs had alleged a credible threat of enforcement of Ohio's false statement statute amounting to an Article III injury in fact. 573 U.S. at 161.[2] First, the Supreme Court found that the plaintiffs had alleged intent to engage in a course of conduct affected with a constitutional interest because they pleaded specific statements they had made previously that they intended to make in future election cycles, and that this future conduct was political speech "'affected with a constitutional interest.'" *Id.* (quoting

---

[2] *Driehaus* only addressed the plaintiffs' facial challenge to Ohio's false statement laws, and not their as-applied claims. 573 U.S. at 156, n.3 ("Finally, the parties agree that petitioners' as-applied claims "are better read as facial objections to Ohio's law." Reply Brief 19. Accordingly, we do not separately address the as-applied claims.").

*Babbitt*, 442 U.S. at 298). The Supreme Court found that the plaintiffs' intended future conduct was arguably proscribed by the challenged statute because the statute had a broad sweep and covered the subject matter of the plaintiffs' intended speech. *Id.* at 162. Moreover, a Commission panel had already found probable cause to believe one of the plaintiffs had violated the statute by making the same sort of statements the plaintiffs intended to make in the future. *Id.* It did not matter that the plaintiffs did not allege intent to make statements that were knowingly false as required by the statute: "SBA's insistence that the allegations in its press release were true did not prevent the Commission panel from finding probable cause to believe that SBA had violated the law the first time around. And, there is every reason to think that similar speech in the future will result in similar proceedings, notwithstanding SBA's belief in the truth of its allegations. Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Id.* at 163. (citing *Babbitt*, 442 U.S. at 301).

Finally, the Supreme Court found that the threat of future enforcement of the statute was substantial. *Id.* at 164. The court noted the history of past enforcement in the case before it because SBA was the subject of a complaint in a recent election cycle. *Id.* The court held that the threat was even more substantial because the Commission panel actually found probable cause to believe the SBA's speech violated the false statement statute, and that the credibility of the threat was "bolstered" because "any person" could file a complaint with the Commission, not just a state official. *Id.* The court found that Commission proceedings were not a rare occurrence, and that the combination of the threat of Commission proceedings and criminal prosecution were sufficient to create an Article III injury. *Id.* at 165-66.

Here, Plaintiffs have alleged a sufficient injury in fact. Plaintiffs intend to engage in undercover investigation and reporting of campaigns in the 2020 election cycle "in a manner

substantially similar to the methods they used to investigate, record, and report" on campaigns in Ohio in 2016. (Amend. Compl., ECF No. 4 at ¶¶ 47-48.) But Plaintiffs claim these methods "necessarily require the service of a Veritas reporter, during a political campaign, within the campaign of a candidate for public office for the purpose of reporting unapproved facts without that candidate or campaign's knowledge." (*Id.* at ¶ 51.) Plaintiffs' alleged investigation, recording, and reporting is "arguably affected with a constitutional interest" but proscribed by the statute. *See Driehaus*, 573 U.S. at 161.

The threat of future enforcement is also credible. The same enforcement procedure analyzed in *Driehaus* applies to violations of Ohio Revised Code § 3517.21(A)(1) at issue here. As in *Driehaus*, Plaintiffs were the subject of a complaint filed in 2018 regarding their conduct in the 2016 election—conduct that they intend to repeat in 2020. Though the Commission did not find Plaintiffs violated the statute, they also did not find Plaintiffs' conduct permissible; instead, they dismissed the complaint based on the statute of limitations. Defendants claim the Commission "rarely receives a complaint alleging a violation" of the statute and that only nine complaints have been filed in the last thirty years, none of which have resulted in the Commission finding a violation. (ECF No. 14 at PAGEID#122.) Two complaints were filed in the fall of 2018, however, and one was against Plaintiffs. (ECF No. 23 at PAGEID#208.) Plaintiffs have alleged an injury in fact that is ripe for review. *See Driehaus*, 573 U.S. at 158, n.5 ("The doctrines of standing and ripeness originate from the same Article III limitation. As the parties acknowledge, the Article III standing and ripeness issues in this case boil down to the same question.") (internal citations omitted).

## IV. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 permits a party to seek injunctive relief when the party believes it will suffer immediate and irreparable injury, loss, or damage. Still, an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id.* (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). These considerations are factors the Court must balance, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). "'When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'" *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998)). "With regard to the factor of irreparable injury, for example, it is well-settled that loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (internal quotations omitted).

## V. ANALYSIS

### a. Likelihood of Success on the Merits

The first factor the Court must consider in assessing Plaintiffs' request for a preliminary injunction is whether Plaintiffs have demonstrated a strong likelihood of success on the merits. In

First Amendment cases such as this one, the likelihood of success is often determinative since the other factors necessarily depend upon whether the challenged law is unconstitutional. *Connection Distrib. Co*, 154 F.3d at 288.

Plaintiffs argue that the statute is unconstitutional "because it (1) suppresses and hinders important political expression; (2) suppresses and hinders this political expression on the basis of its contents and the identity of the speaker; and (3) is neither tailored nor the least restrictive means of hindering such expression." (ECF No. 5 at PAGEID#76.) Plaintiffs thus challenge the statute as a content-based restriction on protected activity that fails strict scrutiny.

Defendants, in contrast, argue that the statute "does not implicate constitutionally-protected speech." (ECF No. 14 at PAGEID#128.) They claim that the statute "prohibits lying to obtain employment or an agency position within a campaign when the purpose is to affect the outcome of an election" and that "[s]uch a prohibition does not even implicate the First Amendment, let alone violate it." (*Id*.) Defendants argue that even if the statute did reach protected speech, it passes constitutional scrutiny. (*Id*. at PAGEID#125.)

Defendants also argue that Plaintiffs cannot meet their burden of establishing they are entitled to facial relief. "Where a plaintiff makes a facial challenge under the First Amendment to a statute's constitutionality, the 'facial challenge' is an 'overbreadth challenge.'" *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (quoting *Connection Distrib. Co.*, 154 F.3d at 335). A plaintiff must show substantial overbreadth: "that the statute prohibits a substantial amount of protected speech both in an absolute sense and relative to [the statute's] plainly legitimate sweep[.]" *Id*. (internal quotations omitted). "A facial challenge based on substantial overbreadth 'describe[s] a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental

interest.'" *Id.* at 873 (quoting *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 966 n. 13 (1984)). "To succeed in an overbreadth challenge, therefore, a plaintiff must 'demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the [statute] cannot be applied constitutionally.'" *Id.* (quoting *N.Y. State Club Ass'n v. City of N. Y.*, 487 U.S. 1, 14 (1988)).

Despite bringing a facial challenge to the statute, Plaintiffs only argue that the statute is overbroad in support of their argument that the statute is not narrowly tailored to survive strict scrutiny. (ECF No. 5 at PAGEID#91.) Plaintiffs did not argue the statute was substantially overbroad until oral argument, when they claimed the statute was overbroad because it sweeps in the protected activity Plaintiffs seek to vindicate in their challenge here. Plaintiffs instead focus their arguments on the application of the statute to undercover investigative reporting and argue the statute restricts that constitutionally protected political expression on the basis of its content and that it cannot survive strict scrutiny.

The Supreme Court and the Sixth Circuit have considered facial challenges under the First Amendment that are were not overbreadth challenges; instead, the courts considered whether the regulations were content-based or otherwise restricted protected activity. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) (holding ordinance facially unconstitutional because it prohibited speech based on content and declining to consider overbroad argument); *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) (applying First Amendment "exacting scrutiny" in facial challenge to compelled disclosure of signatory information on referendum petitions); *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016) (applying strict scrutiny to facial challenge of Ohio false statement laws as content-based restrictions); *Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019) (holding ballot-initiative process not a prior restraint in facial challenge to statute under First

Amendment and analyzing under *Anderson-Burdick* framework). The Court will thus address both issues: whether Ohio Revised Code § 3517.21(A)(1) is a content-based restriction on First Amendment activity and whether the statute is substantially overbroad.

### i. Statutory Construction

Before turning to the merits of Plaintiffs' claims, the Court must first construe Ohio Revised Code § 3517.21(A)(1) to understand what it covers. *See, e.g., Speet*, 726 F.3d at 873 ("In other words, the 'first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.'") (quoting *U.S. v. Williams*, 553 U.S.285, 293 (2008)).

"When there is no state law construing a state statute, a federal court must predict how the state's highest court would interpret the statute." *United States v. Simpson*, 520 F.3d 531, 535 (6th Cir. 2008). When confronted with an argument over the meaning of a statute, the Supreme Court of Ohio has stated its "paramount concern" in construing statutes is legislative intent. *State ex rel. Prade v. Ninth Dist. Court of Appeals*, 151 Ohio St.3d 252, 255 (Ohio 2017). The legislature's intent must be determined primarily from the language of the statute itself. *Stewart v. Vivian*, 151 Ohio St.3d 574, 579 (Ohio 2017). In discerning legislative intent, the court considers "the statutory language in context, construing words and phrases in accordance with rules of grammar and common usage." *State Farm Mut. Auto. Ins. Co. v. Grace*, 123 Ohio St.3d 471, 476 (Ohio 2009); *see also* Ohio Rev. Code § 1.42 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). "In conducting this analysis, a court may not add or delete words." *In re Ohio Edison Co.*, 157 Ohio St. 3d 73, 92 (Ohio 2019).

"[W]hen 'the meaning of a statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary.'" *State ex rel. Prade v. Ninth Dist. Court of Appeals*, 151 Ohio St.3d at 255 (quoting *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545 (Ohio 1996)). Ambiguity exists only when the statutory language is "capable of bearing more than one meaning." *State ex rel. Cincinnati Enquirer v. Pike Cty. Coroner's Office.*, 153 Ohio St. 3d 63, 97 (Ohio 2017) (quoting *Dunbar v. State*, 136 Ohio St.3d 181 (Ohio 2013)). If a statute is ambiguous, the court may resort to general rules of statutory interpretation to resolve the ambiguity. *See State ex rel. Herman v. Klopfleisch*, 72 Ohio St. 3d 581, 585 (Ohio 1995). The court may consider the following in determining the intention of the legislature when the statute is ambiguous: "(A) The object sought to be attained; (B) The circumstances under which the statute was enacted; (C) The legislative history; (D) The common law or former statutory provisions, including laws upon the same or similar subjects; (E) The consequences of a particular construction; (F) The administrative construction of the statute." Ohio Rev. Code § 1.49.

Here, Ohio Revised Code § 3517.21(A)(1) provides:

> (A) No person, during the course of any campaign for nomination or election to public office or office of a political party, shall knowingly and with intent to affect the outcome of such campaign do any of the following:
>
>> (1) Serve, or place another person to serve, as an agent or employee in the election campaign organization of a candidate for the purpose of acting to impede the conduct of the candidate's campaign for nomination or election or of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization;

Based on the plain language of the statute, several elements must be met to find a violation of the statute. A person must (1) during the course of a campaign for nomination or election to public office or office of a political party (2) knowingly and with the intent to affect the outcome

18

of that campaign (3) serve, or place another person to serve (4) as an agent or employee in the election campaign organization of a candidate (5) for the purpose of acting to impede the conduct of the candidate's campaign for nomination or election **or** of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization. *See* Ohio Rev. Code § 3517.21(A)(1) (emphasis added).

Plaintiffs call Ohio Revised Code § 3517.21(A)(1) "the Reporting Restriction" and claim it "unconstitutionally inhibit[s] Plaintiffs and others from gathering and reporting newsworthy political information that can only be acquired through undercover investigation" in violation of the First Amendment. (ECF No. 5 at PAGEID#72.) Specifically, Plaintiffs claim that because of the statute, "no citizen, journalist or otherwise, may 'go undercover' within a political campaign to acquire and report unapproved information about that politician or campaign - - even if the information in question is true - - without risking subjection to OEC hearings, fines, and even imprisonment." (*Id.* at PAGEID#73). Plaintiffs allege the statute "suppresses serving on or around a campaign if and only if for purpose of 'reporting' unapproved political information. This expressive activity constitutes quintessential newsgathering: creation (recording) and publication of information. Consequently, the Reporting Restriction implicates core protected expression of investigative reporting on politics." (*Id.* at PAGEID#79.)

Defendants, in contrast, argue that the statute "prohibits people from lying to obtain employment with a campaign when their purpose is to harm that campaign." (ECF No. 14, PAGEID#119.) This "anti-infiltration statute," according to Defendants, "prohibits people from lying in order to get employment with a campaign when the purpose is to impede the campaign or to report confidential information without the campaign's knowledge. Ohio's law does not reach beyond lying to gain employment or an agency position." (*Id.* at PAGEID#125.) They further

argue that the statute "prohibits fraudulently obtaining employment when the purpose is to affect the outcome of an election—*i.e.* harm the campaign." (*Id.* at PAGEID#132.)

Plaintiffs claim that Defendants' construction "requires this Court to rewrite the Reporting Restriction to read in a manner departing from how the Ohio General Assembly actually drafted it." (ECF No. 23 at PAGEID#181.) Plaintiffs identify several reasons why Defendants' construction is not supported by the plain language of the statute.

First, Plaintiffs clarify that they challenge only the "reporting" clause of the statute, not the "impeding" clause, which they view as "distinct and diffident" clauses. (ECF No. 23 at PAGEID#181.) Plaintiffs claim that their challenge "is to the face of the 'reporting' clause, solely when it, rather than the 'impeding' clause, is implicated as the reason for the violation of R.C. 3517.21(A)(1)." (*Id.* at PAGEID#182.) They argue:

[T]he presence of the "impeding" as an alternative to the Reporting Restriction plainly demonstrates that the two differ from one another: "reporting information" about a campaign is not "impeding" a campaign. The General Assembly deliberately chose to employ these two separate prohibitions rather than employing language merely articulating one of the two, or in the alternative articulating a broad standard prohibiting any action that could inhibit a campaign. A reporter's service triggers the Reporting Restriction only when pursued with an intent to report information that is unapproved by the campaign.

(ECF No. 23 at PAGEID#181-82). Plaintiffs further argue that Defendants' construction must fail because the statute is not limited to those who gain access through overt misrepresentation: "[i]ndeed, the Restriction is entirely silent as to how a reporter acquires the opportunity to serve the campaign - - it contains no text whatsoever requiring misrepresentation as an element of the offense." (*Id.* at PAGEID#183.) Plaintiffs claim the language of the statute extends beyond employees—the inclusion of "agents" could include volunteers or others not seeking paid employment or other material gain. (*Id.* at PAGEID#184.) Plaintiffs also argue that the statute says nothing of falsity, nor does it reference harm at all: "there is no textual requirement that the

20

investigator intend to harm or actually harm the campaign." (*Id.* at PAGEID#188.) Plaintiffs further argue that the statute is not limited to fraudulent conduct or disclosure of confidential information. (*Id.* at PAGEID#191-95).

The Court agrees that Defendants' construction of Ohio Revised Code § 3517.21(A)(1) is not supported by the plain language of the statute. The statute does not directly restrict false statements or require a misrepresentation as an element of the offense. The statute does not reference falsity or fraud at all. The Court also agrees with Plaintiffs that the impeding and reporting clauses are separate clauses and cannot be conflated. Moreover, "intent to affect the outcome" cannot be read to mean "intent to cause harm." As Plaintiffs point out, "intent to affect the outcome" is undefined. But as Defendants argue, "[u]ndefined words are to be accorded their common, everyday meaning. *State v. Dorso*, 4 Ohio St.3d 60, 62, 446 N.E.2d 449 (1983); *MP Star Financial*, 107 Ohio St.3d 176, 178, 837 N.E.2d 758 (2005)." (ECF No. 14 at PAGEID#146.) As defined by Merriam-Webster, "affect" means "to produce an effect upon: such as a) to produce a material influence upon or alternation in, or b) to act upon (a person, a person's mind or feelings, etc.) so as to effect a response; influence." *See Affect*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/affect (last visited Nov. 15, 2019). While "producing an effect upon" or "influencing" something could result in some harm, there is no requirement in the statute requiring that the effect or influence be negative or harmful. Accordingly, one intending to affect the outcome of a campaign may seek to do so by causing some harm to the campaign, but the statute is not so limited. The Court cannot add words or re-write the statute to add requirements that are not there, *see In re Ohio Edison Co.*, 157 Ohio St. 3d at 92, and find Defendants' interpretation of the statute as unsupported by its plain language.

The statute, as written and challenged by Plaintiffs, applies to persons who knowingly and with the intent to affect the outcome of a campaign, serve, or place another person to serve, as an agent or employee in the campaign for the purpose of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization. The Court will thus analyze the statute as written under the First Amendment. *See Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 377 (6th Cir. 2019).[3]

## ii. Restriction on First Amendment Protected Activity

Having construed the statute, the Court now turns to whether the statute implicates activity protected by the First Amendment. "The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law...abridging the freedom of speech.'" *Virginia v. Black*, 538 U.S. 343, 358 (2003). The First Amendment affords protection not only to actual speech, but also to symbolic or expressive conduct. *Id.* (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (cross burning); *Texas v. Johnson,* 491 U.S. 397, 405-406 (1989) (flag burning); *United States v. O'Brien*, 391 U.S. 367, 376-77 (burning draft registration card); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969) (wearing armbands)).

The First Amendment generally means "'that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S.

---

[3] Federal courts are obliged to avoid constitutional questions if an alternative interpretation of the statute is possible, even if it is not the best reading. *See Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 376–77 (6th Cir. 2019) (citing *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 18 (2013)). "However, this canon of statutory interpretation does not allow us to re-write an unconstitutional statute to save it." *Id.* "The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them*." *Id.* (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). "In other words, where a statute is susceptible to multiple interpretations, at least one of which will render the statute constitutional, we adhere to that interpretation over an interpretation that would require us to invalidate the statute." *Id.*

564, 573 (2002)). "The protections afford by the First Amendment, however, are not absolute[.]"

*Black*, 538 U.S. at 358. The Supreme Court has permitted restrictions on the content of speech in

a "few 'historic and traditional categories [of expression] long familiar to the bar.'" *United*

*States v. Alvarez*, 567 U.S. 709, 717 (2012) (quoting *Stevens*, 559 U.S. at 468). Among these

categories of unprotected speech are:

> [A]dvocacy intended, and likely, to incite imminent lawless action, see *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) *(per curiam)*; obscenity, see, *e.g., Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); defamation, see, *e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (providing substantial protection for speech about public figures); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (imposing some limits on liability for defaming a private figure); speech integral to criminal conduct, see, *e.g., Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949); so-called "fighting words," see *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); child pornography, see *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); fraud, see *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); true threats, see *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) *(per curiam)*; and speech presenting some grave and imminent threat the government has the power to prevent, see *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), although a restriction under the last category is most difficult to sustain, see *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) *(per curiam)*.

*Id.* at 717-18. These categories of unprotected speech "have a historical foundation in the Court's

free speech tradition. The vast realm of free speech and thought always protected in our tradition

can still thrive, and even be furthered, by adherence to those categories and rules." *Id.* at 718.

### 1. Fraud and *United States v. Alvarez*

The parties disagree as to whether the statute implicates the First Amendment. Plaintiffs

argue that the statute suppresses Plaintiffs' protected expression. Specifically, Plaintiffs claim that

"[t]he very thing hindered and suppressed by the Reporting Restriction - - Plaintiffs' practice of

investigating candidates and campaigns for the sole purpose of reporting political information - - constitutes protected expressive activity." (ECF No. 5, PAGEID#76-77) (emphasis original).

Defendants, in contrast, argue that the statute "does not implicate constitutionally-protected speech." (ECF No. 14 at PAGEID#128.) They claim that the statute "prohibits lying to obtain employment or an agency position within a campaign when the purpose is to affect the outcome of an election" and that "[s]uch a prohibition does not even implicate the First Amendment, let alone violate it." (*Id.*) Defendants cite to *United States v. Alvarez* for the proposition that "when 'false claims are made to effect a fraud or secure moneys or other valuable considerations, say, *offers of employment*, it is well established that the government may restrict speech without affronting the First Amendment.'" (ECF No. 14, PAGEID#128.) Defendants thus contend that the statute falls within this category of unprotected speech as set forth in *Alvarez*. (*Id.* at PAGEID#129.) According to Defendants, the statute prohibits "deceptively serving 'as an agent or employee[,]'" that the focus of the statute "is effecting a fraud in order to get employment with an election campaign," and that under *Alvarez*, "the state may prohibit fraudulently obtaining employment." (*Id.* at PAGEID#129-130.)

*Alvarez* involved a challenge to a statute that expressly prohibited false statements about receiving military decorations or medals, including the Congressional Medal of Honor. 567 U.S. at 715. The plurality opinion rejected the notion that "false speech should be in a general category that is presumptively unprotected." *Id.* at 722. The Court found the statute unconstitutional, noting that it sought "to control and suppress all false statements on this one subject in almost limitless times and settings. And it does so entirely without regard to whether the lie was made for the purpose of material gain." *Id.* at 722-23. But, as Defendants note, the Court recognized that the

government may restrict speech when "false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment[.]" *Id.* at 723.

Defendants argue that "Plaintiffs' focus on their ability to report on those campaigns and to gather news does not change the analysis." (ECF No. 14 at PAGEID#131.) According to Defendants, one of the key cases Plaintiffs rely on "is instructive on this point." (*Id.*) The Ninth Circuit's decision in *Animal Legal Defense Fund v. Wasden* analyzed four different provisions of an Idaho statute "targeted at undercover investigation of agricultural operations" in an appeal highlighting "the tension between journalists' claimed First Amendment right to engage in undercover investigations and the state's effort to protect privacy and property rights in the agricultural industry." 878 F.3d 1184, 1189-90 (9th Cir. 2018). *Alvarez* and *Wasden* recognized that false statements may be criminalized if made for the purpose of material gain or if it inflicts a legally cognizable harm. *Id.* at 1194 ("We thus focus our attention on misrepresentations of the type singled out by the Court [in *Alvarez*]—false statements made for material gain or advantage or that inflict harm.").

First, the Idaho statute criminalized knowingly "obtain[ing] records of an agricultural production facility by force, threat, misrepresentation, or trespass[.]" *Id.* at 1190-91. The Ninth Circuit noted that "*Alvarez* highlights that a false statement made in association with a legally cognizable harm or for the purpose of material gain is not protected" and that "false statements made to actually acquire agricultural production facility records inflict a property harm upon the owner, and may also bestow a material gain on the acquirer." *Id.* at 1199. The Ninth Circuit found that this section of the statute did not regulate protected speech and did not violate the First Amendment. *Id.* at 1200.

Second, the statute criminalized "obtain[ing] employment with an agricultural facility by force, threat, or misrepresentation with the intent to cause economic or other injury to the facility's operations, livestock, crops, owners, personnel, equipment, buildings, premises, business interests or customers[.]" *Id* at 1190-91. The Ninth Circuit held that the misrepresentations criminalized in this subsection fell squarely into the category of speech *Alvarez* recognized as unprotected. *Id.* at 1201. The subsection was further limited to "only those who gain employment by misrepresentation *and* who have the intent to cause economic or other injury to the agricultural production facility, which further cabins the prohibition's scope." *Id.* at 1201. (emphasis original).

Defendants argue that Ohio's statute is no different from *Wasden* and does not implicate the First Amendment because it "prohibits fraudulently obtaining employment when the purpose is to affect the outcome of an election—*i.e.* harm the campaign." (ECF No. 14, PAGEID#132.) However, Defendants' reliance on *Wasden* and *Alvarez* in support of the argument that the statute does not implicate the First Amendment because it prohibits lying to obtain employment is misplaced. (*Id.* at PAGEID#128-31.) As previously discussed, Ohio Revised Code § 3517.21(A)(1) does not require any false statements or fraud be made in order for a violation to occur. Based on the plain language of the statute, the Court does not agree that it regulates "lying to obtain employment." While someone who serves as an agent or employee with the intent to affect the outcome of the election in order to report information *may* have gained that position by some fraud, misrepresentation, deception, or other false speech, the statute says nothing of any of those elements. The Court finds Defendants' arguments based on *Wasden* and *Alvarez* inapplicable.

26

## 2. Investigative Reporting as Protected Expressive Activity

The Court instead focuses on the activity Plaintiffs claim is protected by the First Amendment and implicated here—investigative reporting. Specifically, Plaintiffs claim that "[t]he very thing hindered and suppressed by the Reporting Restriction - - Plaintiffs' practice of investigating candidates and campaigns for the sole purpose of reporting political information - - constitutes protected expressive activity." (ECF No. 5, PAGIED#77-78) (emphasis original). They further claim the statute "suppresses serving on or around a campaign if and only if for purpose of 'reporting' *unapproved* political information. This expressive activity constitutes quintessential newsgathering: creation (recording) and publication of information. Consequently, the Reporting Restriction implicates core protected expression of investigative reporting on politics." (ECF No. 5, PAGEID#79) (emphasis original). Additionally, Plaintiffs claim "the Reporting Restriction, as actually written and enforced, impermissibly suppresses, hinders, and obstructs constitutionally-protected investigative reporting." (ECF No. 23 at PAGEID# 179.)

The Supreme Court has recognized that "news gathering is not without its First Amendment protections[.]" *Branzburg v. Hayes*, 408 U.S. 665, 707 (1972). But the Supreme Court has also held that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information," *Zemel v. Rusk*, 381 U.S. 1, 17 (1965), and that the First Amendment "does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684; *see also Pell v. Procunier*, 417 U.S. 817, 833 (1974) ("The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally."). The Supreme Court has further stated that "generally applicable laws do not offend the First Amendment simply because their

enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

But it is not just investigative reporting Plaintiffs claim is protected. According to Plaintiffs, "undercover investigation of politicians and their campaigns, for the purposes of publicizing newsworthy findings, is suppressed by the Reporting Restriction but protected by the First Amendment." (ECF No. 5, PAGEID#76.) Plaintiffs rely heavily on cases from other circuits, including the Ninth Circuit's decision in *Wasden*, for their claim that "newsgathering through recording while undercover, especially with the intent to communicate or broadcast, is protected by the First Amendment." (*Id*. at PAGEID#78.)

In *Wasden*, the Ninth Circuit upheld the district court's invalidation of "the Recordings Clause" of the Idaho statute prohibiting a person from entering a private agriculture production facility, and without the express consent from the facility owner, making audio or video recordings of the conduct of an agriculture production facility's operations. 878 F.3d at 1203. The Ninth Circuit held that the Recordings Clause "regulates speech protected by the First Amendment and is a classic example of a content-based restriction that cannot survive strict scrutiny." *Id*. The Ninth Circuit stated:

> We easily dispose of Idaho's claim that the act of creating an audiovisual recording is not speech protected by the First Amendment. This argument is akin to saying that even though a book is protected by the First Amendment, the process of writing the book is not. Audiovisual recordings are protected by the First Amendment as recognized "organ[s] of public opinion" and as a "significant medium for the communication of ideas."

> \*\*\*

> It is no surprise that we have recognized that there is a "First Amendment right to film matters of public interest." It defies common sense to disaggregate the creation of the video from the video or audio recording itself. The act of recording is itself an inherently expressive activity; decisions about content, composition, lighting, volume,

and angles, among others, are expressive in the same way as the written word or a musical score.

*Id.* at 1203 (internal citations omitted). The Ninth Circuit upheld invalidation of a subsection of that same statute that criminalized entry into an agriculture production facility by misrepresentation because it targeted false statements. *Id.* at 1194. The court rejected the argument that gaining access to the facility was a "material gain" as required by *Alvarez*, or that the statute only regulated conduct. *Id.* at 1194-95; *see also Animal Legal Def. Fund v. Reynolds*, 353 F.Supp.3d 812, 824-27 (S.D. Iowa 2019) (striking down statute criminalizing willfully obtaining access to an agricultural facility by false pretenses or making a false statement as part of an employment application or agreement with the intent to commit an act not authorized by the owner of the facility implicated speech because "one cannot violate [the statute] without engaging in speech.").

In *Animal Legal Defense Fund v. Herbert*, the court considered an Utah statute containing a "lying provision" and three "recording provisions. 263 F.Supp.3d 1193, 1198 (D. Utah 2017). The lying provision criminalized obtaining access to an agricultural operation under false pretenses, and the three recording provisions criminalized bugging an agricultural operation, filming an agricultural operation after applying for a position with the intent to film, and filming an agricultural operation while trespassing. *Id.* The court found that the lying provision prohibited lies that did not cause legally cognizable harm and were protected by the First Amendment. *Id.* at 1202. The court rejected the argument that lies prohibited by the statute could cause harm to animals or workers, or cause a legally cognizable trespass harm. *Id.* at 1205. The court also found that the statute criminalized more than just lies to gain employment, and was subject to First Amendment scrutiny. *Id.* at 1206.

29

The court then turned to the recording provisions. The court first noted that "[t]here has been no definitive word from the Supreme Court or the Tenth Circuit on whether recording is speech for First Amendment purposes" but that "it appears the answer likely is yes." *Id.* at 1206-07. Other circuits had directly addressed the question and found that the act of making a recording was protected. *Id.* at 1207. The court concluded:

> In sum, it appears the consensus among courts is that the act of recording is protectable First Amendment speech. And this court agrees. Were the law otherwise, as the State contends, the State could criminalize, for example, creating music videos, or videos critical of the government, or any video at all, for that matter, with impunity. In other words, the State could do indirectly what the Supreme Court has made clear it cannot do directly. Because recordings themselves are protected by the First Amendment, so too must the making of those recordings be protected. This is not to say the State cannot regulate the act of recording; it is merely to say that if it wishes to do so, the State must justify and narrowly tailor the restriction, as with any other constraint on protected speech.

*Id.* at 1208. The court concluded that the lying provision and the recording provisions were content-based and could not survive strict scrutiny. *Id.* at 1213.

None of these cases, however, expressly holds that undercover investigative reporting is protected expressive activity under the First Amendment. Instead, these cases analyzed restrictions on false statements, disclosure of information, and/or audio or visual recordings. The Supreme Court has generally recognized that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). And while the Sixth Circuit has not expressly held[4] that the making of audio and visual recordings

---

[4] In *Enoch v. Hogan*, the Sixth Circuit held that based on the complaint, state officials were not entitled to qualified immunity when they arrested two individuals, one of whom was a reporter, for recording an impromptu press conference in a courthouse hallway. The Sixth Circuit recognized that it had "long and clearly held that newsgathering 'qualif[ies] for First Amendment protection.'" 728 Fed.Appx. 448, 456 (6th Cir. 2018) (quoting *Boddie v. Am. Broad. Cos.*, 881 F.2d 267, 271 (6th Cir. 1989)). And "while trial-related newsgathering may be subjected to reasonable restrictions and limitations," the court assumed the plaintiffs had violated no rule. *Id.* The court held that the officials could not constitutionally prevent the individuals from or punish them for gathering news about matters of public importance when they violated no rules or laws, and that the plaintiffs had plausibly alleged a violation of their First Amendment rights. *Id.* Moreover, the court held those rights were clearly established because "[d]ecades ago, the Supreme Court established with clarity that the First Amendment protects the rights of both the media and the general

is protected by the First Amendment, several other circuit and district courts have, especially in the context of recording government officials in public. *See ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) (Illinois eavesdropping statute unconstitutional as applied to recording of police officers performing official duties in public); *Martin v. Gross*, 340 F.Supp.3d 87 (D.Mass. 2018) (Massachusetts statute violated First Amendment as applied to recording public officials, including law enforcement, performing their duties in public); *see also Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017); *Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014); *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995).

The Supreme Court has also recognized protections for the disclosure of information lawfully obtained by newsgatherers, *see Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979) and *Florida Star v. B.J.F.*, 491 U.S. 524 (1989), even when a third-party unlawfully acquired the information sought to be disclosed. *See New York Times Co. v. United States*, 403 U.S. 713 (1971) *(per curiam)*; *see also Bartnicki v. Vopper*, 532 U.S. 514 (2001).

Plaintiffs seek to piece together these protections courts have recognized for recording and disclosing information to argue undercover investigative reporting is "newsgathering" that is protected expressive activity. Plaintiffs contend that "the very thing hindered and suppressed by the Reporting Restriction - - Plaintiffs' practice of investigating candidates and campaigns for the sole purpose of reporting political information - - constitutes protected expressive activity." (ECF No.5 at PAGIED#76-77.) Specifically, Plaintiffs contend "newsgathering through *recording* while undercover, especially with the intent to communicate or broadcast, is protected by the First

---

public to attend and share information about the conduct of trials, 'where their presence historically has been thought to enhance the integrity and quality of what takes place.'" *Id.* (quoting *Richmond Newspapers v. Virginia*, 448 U.S. 555, 578 (1980)).

Amendment." (ECF No. 5 at PAGEID#78) (emphasis added). They conclude: "[h]ere, R.C. 3517.21(A) suppresses serving on or around a campaign if and only if for purpose of 'reporting' unapproved political information. This expressive activity constitutes quintessential newsgathering: *creation (recording) and publication* of information. Consequently, the Reporting Restriction implicates core protected expression of investigative reporting on politics." (*Id.* at PAGEID#79) (emphasis added).

But Ohio Revised Code § 3517.21(A)(1) does not directly regulate the making of audio or visual recordings or subsequent disclosure of information. Instead, the statute regulates serving as an agent or employee in a campaign for the purpose of reporting information. Though Plaintiffs contend that reporting necessarily includes recording and disclosing information, Ohio Revised Code § 3517.21(A)(1) regulates service as an agent or employee, one-step removed from those protected activities.

The Court thus finds that Ohio Revised Code § 3517.21(A)(1) is primarily directed at conduct: "serv[ing] as an agent or employee." The Court, however, cannot ignore that the statute applies to "serv[ing] as an agent or employee...*for the purpose of reporting information*[.]" *Id.* (emphasis added). Plaintiffs claim Ohio Revised Code § 3517.21(A)(1) "hinders, suppresses, deters, and punishes this newsgathering because it is *triggered by an intention to engaged in protected newsgathering and reporting*," (*Id.* at PAGIED#77) (emphasis original), and that "[d]eterring and hindering newsgathering, rather than directly prohibiting it, is sufficient to trigger First Amendment scrutiny and protection." (*Id.* at PAGIED#79.) Plaintiffs further claim that the statute "is only implicated where it is the purpose of the reporter to 'report information.' It therefore directly singles out and implicates newsgathering." (ECF No. 23 at PAGEID#196.)

Plaintiffs contend that the Supreme Court and the Sixth Circuit[5] "are clear that activity that may typically be regarded as 'conduct' is in fact speech when it is carried out *for the purpose of communicating a message*." (*Id.* at PAGEID#196) (emphasis original). Plaintiffs contend that "'[g]oing undercover,' if conduct at all, is merely the 'conduct' necessary to acquire and convey the disapproved information to the public." (*Id.* at PAGEID#197-98.) According to Plaintiffs, the statute "expressly prohibits service in the campaign 'for the purpose of…reporting information'" and thus "the First Amendment applies with full force here." (ECF No. 23 at PAGEID#197.)

While Ohio Revised Code § 3517.21(A)(1) is primarily directed at conduct, the statute may also implicate "protected expressive activity" as Plaintiffs claim. The Supreme Court has considered challenges to regulations of conduct that "incidentally burden" expressive activity. In *United States v. O'Brien*, the Supreme Court considered whether the 1965 Amendment to the Universal Military Training and Service Act prohibiting the knowing destruction or mutilation of draft registration certificates was unconstitutional as applied to O'Brien because his act of burning his registration certificate was protected "symbolic speech" within the First Amendment. 391 U.S. 367, 376 (1968). His argument was that "freedom of expression which the First Amendment guarantees includes all modes of 'communication of ideas by conduct,' and that his conduct is within this definition because he did it in 'demonstration against the war and against the draft.'" *Id.*

The Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* The Supreme Court held that "even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not

[5] *See Bartnicki*, 532 U.S. at 553; *Pagan v. Fruchey*, 492 F.3d 766, 772 (6th Cir. 2007) (en banc).

necessarily follow that the destruction of a registration certificate is constitutionally protected activity." *Id.* Accordingly, "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important government interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.*

The Supreme Court has applied *O'Brien* in cases "involving government regulation of conduct that has an expressive element." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) (application of state statute authorizing closure of building found to be a public health nuisance on bookstore); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) (application of regulation prohibiting camping in public park and on Mall in Washington D.C., on demonstrators who sought to sleep overnight in parks as protest against homelessness); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) (application of state statute prohibiting complete nudity in public places on nude dancing establishment); *United States v. Albertini*, 472 U.S. 675 (1985) (application of federal statute making it unlawful to reenter a military base after having been barred by the commanding officer on protester).

*O'Brien* thus sets forth "the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (citing *O'Brien*, 391 U.S. 367 and *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)); *see also Richland Bookmart, Inc. v. Knox Cty., Tenn.*, 555 F.3d 512, 521 (6th Cir. 2009) ("In *O'Brien*, the Supreme Court set out the intermediate scrutiny standard for the constitutionality of content-neutral regulations of expression and applied it to a regulation of general conduct (a prohibition on the destruction of Selective Service draft cards) that incidentally burdened "symbolic speech" or "expressive conduct" (the burning of a draft card to protest the war)."). A content-neutral regulation will be sustained "if it advances important governmental

interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997) (citing *O'Brien*, 391 U.S. at 377). The Second Circuit has noted that: "[t]he Supreme Court's approach to determining content-neutrality appears to be applicable whether what is regulated is expression, *see* [*Ward*] at 791-93, 109 S.Ct. 2746 (regulation of volume of music), conduct, *see O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673, or any 'activity' that can be said to combine speech and non-speech elements, *see Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (applying *O'Brien* to 'activity' of displaying American flag hung upside down and decorated with a peace symbol)." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449-51 (2d Cir. 2001); *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 385 (1992) ("We have long held, for example, that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not."); *Barnes*, 501 U.S. at 566-68 (1991) (finding Indiana's public indecency statute was justified under *O'Brien* "despite its incidental limitations on some expressive activity.").

But "[i]f the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (citing *Texas v. Johnson*, 491 U.S. 397, 403 (1989)). *O'Brien* is thus inapplicable when a statute is content-based or regulates pure speech, rather than conduct. For example, in *Bartnicki v. Voppper*, the Supreme Court held that the Federal Wiretapping Act's total ban on disclosures was "fairly characterized as a regulation of pure speech" rather than conduct, adopting the court of appeals' logic that "[i]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine

what does fall within that category, as distinct from the category of expressive conduct." 532 U.S. at 527.[6] In *Holder v. Humanitarian Law Project*, the Supreme Court rejected the government's argument that the federal material-support statute was directed at the plaintiffs' conduct and only incidentally burdened their expression. 561 U.S. 1, 26 (2010). The Court held that *O'Brien* did not provide the applicable standard for reviewing a content-based regulation of speech, and that the material-support statute instead regulated speech on the basis of content: "Plaintiffs want to speak to the PKK and LTTE, and whether they may do so under § 2339B depends on what they say." *Id.* at 27. The Supreme Court also rejected the argument that the statute was subject only to intermediate scrutiny. While the law could be described as directed at conduct, "as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message," rendering it content-based. *Id.* at 28.

Assuming, as the Supreme Court did in *O'Brien* and *Clark*, that Plaintiffs' alleged "expressive activity" of "investigating candidates and campaigns for the sole purpose of reporting political information" is protected by the First Amendment, the Court finds that Ohio Revised Code § 3517.21(A)(1) falls into the category identified in *O'Brien* and its progeny. The statute is primarily directed at the conduct of "serv[ing] as an agent or employee" in a campaign. Nevertheless, this regulation of conduct may have an "incidental burden" on Plaintiffs' claimed protected expression because "[t]he very thing hindered and suppressed by the Reporting Restriction - - Plaintiffs' practice of investigating candidates and campaigns for the sole purpose of reporting political information - - constitutes protected expressive activity" and the statute "is

---

[6] In *Bartnicki*, telephone conversations between two school teacher union representatives were surreptitiously recorded by a third party, in violation of 18 U.S.C. § 2511, the Federal Wiretap Act. Nonetheless, Vopper, a radio talk-show host, played the recorded conversations on his program, resulting in the claims of the declarants. The Supreme Court found that the Wiretap Act violated the defendants' First Amendment rights as applied to those specific facts. *Id.* at 534.

triggered by an intention to engaged in protected newsgathering and reporting." (ECF No. 5 at PAGEID#76-77.)

### iii. Level of Scrutiny

Intermediate scrutiny thus applies to Ohio Revised Code § 3517.21(A)(1) so long as it is content-neutral. Though outside of the context of *O'Brien*, Plaintiffs' main argument is that the statute is "subject to strict scrutiny because it is content-based, speaker-based, and burdens core political speech." (ECF No. 5 at PAGEID#80.) They argue that the statute applies "only to the investigation of and reporting on a political campaign by those who intend to critically scrutinize the campaign, without imposing similar reporting limits on other topics, subjects, operations, or organizations." (*Id.*) Plaintiffs also point to other provisions of Ohio Revised Code § 3517.21 that the Sixth Circuit and Ohio courts have found to be content-based. (*Id.* at PAGEIDE#83.)

"Deciding whether a particular regulation is content based or content neutral is not always a simple task...As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner*, 512 U.S. at 642-43. "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (citing *Clark*, 468 U.S. at 293).

More recently, the Supreme Court has stated that a law is content-based if it "applies to a particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, — U.S. —, 135 S.Ct. 2218, 2227 (2015). The "commonsense meaning" of content-based requires a court to consider "whether a regulation of speech 'on its face' draws distinctions

based on the message a speaker conveys." *Id.* "Statutes that are not content based on their face may still be considered content based if they 'cannot be justified without reference to the content of the regulated speech' or 'were adopted by the government because of disagreement with the message the speech conveys.'" *Comm. to Impose Term Limits v. Ohio Ballot Bd.*, 885 F.3d 443, 447 (6th Cir. 2018) (quoting *Reed*, 135 S.Ct. at 2227).

Plaintiffs' claims are not well-taken. Ohio Revised Code § 3517.21(A)(1) applies to all reporting of information without the campaigns' knowledge, and does not prohibit reporting information only on certain topics or only when certain messages are conveyed. Like the statute in *Committee to Impose Term Limits*, whether someone violates the statute here depends not on what information they report, but whether they do so without the campaign's knowledge. Furthermore, the subsections of the statute found to be content-based in *Magda v. Ohio Elections Comm'n*, 2016-Ohio-5043, 58 N.E.3d 1188 (10th Dist. 2016) and *Susan B. Anthony List*, 814 F.3d 466 (6th Cir. 2015) are different from the subsections here. Those subsections regulated false statements about voting records and whether or not candidates held the offices being sought— clear restrictions on topics and messages. Ohio Revised Code 3517.21(A)(1) regulates "reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization" with no restrictions on the topics disclosed or message expressed. The statute is content-neutral, and thus intermediate scrutiny, not strict scrutiny, applies.

A content-neutral law survives intermediate scrutiny "'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *Turner*, 512 U.S. at 662 (quoting *O'Brien*, 391 U.S. at 377).

Defendants set forth several government interests advanced by Ohio Revised Code § 3517.21(A)(1): protecting the integrity of Ohio's elections and the associational rights of campaigns, and protecting against the invasion of privacy. The Sixth Circuit has recognized that "Ohio's interests in preserving the integrity of its elections, protecting 'voters from confusion and undue influence,' and 'ensuring that an individual's right to vote is not undermined by fraud in the election process' are compelling." *Driehaus*, 814 F.3d at 473. Defendants argue Ohio Revised Code § 3517.21(A)(1) protects the integrity of the election process in two ways. They first argue the statute safeguards generally against fraud, and that it "forbids fraudulent infiltration for the purpose of interfering with or affecting the outcome of a campaign—i.e., it protects the integrity of the election process by prohibiting the perpetration of fraud to impact the outcome." (ECF No. 14 at PAGEID#137). However, as previously discussed, fraud is not an element of the statute, and the statute cannot be read as only prohibiting "fraudulent infiltration."

But Defendants also argue that the statute protects the integrity of the election process by protecting the associational rights of political organizations and campaigns. (*Id.*) Because the First Amendment protects the right to free association, campaign organizations have an interest in keeping their communications, sources, and uses of funds, and internal plans and deliberations confidential. *See AFL-CIO v. FEC*, 333 F.3d 168, 177 (D.C. Cir. 2003). Disclosure of organizations' confidential internal materials "intrudes on the 'privacy of association and belief guaranteed by the First Amendment,' as well as seriously interferes with internal group operations and effectiveness. *Id.* at 177-78 (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)). And, the "right to associate with others to advance one's shared political beliefs" entails "the right to exchange ideas and formulate strategy and messages, and to do so in private." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1162 (9th Cir. 2010). Closely related to this interest is the claim that the statute protects

against the invasion of privacy. Defendants claim that "Ohio has a substantial and compelling interest in the protection of private conversations within campaigns with its anti-infiltration statute. The protection of private speech encourages speech and expression." (ECF No. 14 at PAGEID#140.)

Defendants arguments are well-taken. Though the statute does not require fraud or some unlawful conduct, the statute still advances the state's interests of protecting the integrity of the election process and campaigns' freedom of association and privacy interests. The statute applies to individuals who "inten[d] to affect the outcome" of a campaign and "serve, or place another person to serve, as an agent or employee" in a campaign "for the purpose of…reporting information to the employee's employer or the agent's principal without the knowledge" of the campaign. *See* Ohio Revised Code § 3517.21(A)(1). Permitting people who intend to affect the outcome of a campaign to "infiltrate" a campaign by serving as an agent or employee for the purpose of reporting information without the campaign's knowledge, regardless of whether they obtained that position through fraud or other unlawful conduct, can have a chilling effect on political participation and association. As Defendants argue, "[i]f campaigns cannot trust their employees to keep their information confidential—for fear of a mole—then they will be hampered in their ability to express their beliefs and strategies with others in the campaign." (ECF No. 14 at PAGEID#140.)

These interests are unrelated to the suppression of free expression. The Sixth Circuit has recognized that this element is met if the regulation is content-neutral. *See In re Tenn. Public Indecency Statute*, 172 F.3d 873 (Table), 1999 WL 55276, at *3 (6th Cir. 1999) (per curiam) (citing *Clark*, 468 U.S. at 298). The Court has already found that the statute here is content-neutral and thus finds it is unrelated to the suppression of free expression.

Finally, the statute is sufficiently narrowly tailored to survive the third prong of intermediate scrutiny. The Supreme Court has said to satisfy intermediate scrutiny, "a regulation need not be the least speech-restrictive means of advancing the Government's interests." *Turner*, 512 U.S. at 662. The narrow tailoring requirement is satisfied as long as "the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* (quoting *Ward*, 491 U.S. at 799). "Narrow tailoring in this context requires, in other words, that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward*, 491 U.S. at 799).

Plaintiffs, however, argue that strict scrutiny applies and did not analyze the statute under intermediate scrutiny. They first argue the statute is not necessary to advance a compelling government interest. (ECF No. 5 at PAGEID#84-87; ECF No. 23 at PAGEID#199-202.) Plaintiffs claim that protecting politicians from unwanted reporting of newsworthy political information is not a compelling government interest, and that shielding information from the public actually undermines the integrity of elections and harms the public. (ECF No. 5 at PAGEID#85-86; ECF No. 23 at PAGEID#201.) They further argue that statute does not directly advance Defendants' stated interests because it is not limited to punishing the disclosure of confidential information or the reporting of false misleading information. (*Id.*) Relatedly, Plaintiffs claim the statute is overinclusive because it applies to the reporting of truthful information and is not limited to malicious, false, defamatory, or damaging information, nor is it limited to preventing reporting where the information was acquired unlawfully or by some fraud. (ECF No. 5 at PAGEID#91-92; ECF No. 23 at PAGEID#203.) But Plaintiffs argue the statute is also underinclusive because it does not apply to those who report information about the campaign with the campaign's knowledge, to disaffected employees who once served to advance the campaign but later report

41

information, or to other organizations like Political Action Committees, labor unions, private corporations, etc. (ECF No. 5 at PAGEID#92-94; ECF No. 23 at PAGEID#203-205.)

Plaintiffs also argue that less restrictive means are available to achieve the government interests here—campaigns can protect themselves through screening employees and requiring confidentiality agreements, or seek remedies through generally-applicable contract or tort law. (ECF No. 5 at PAGEID#87-88; ECF No. 23 at PAGEID#205-08.) Plaintiffs also claim that the statute's timing and screening procedures are not narrowly tailored.

Defendants argue that statute is narrowly tailored to serve compelling government interests in protecting the integrity of elections and the associational rights of campaigns and protecting against the invasion of privacy. (ECF No. 14 at PAGEID#140-144.) They claim that the statute is targeted at a specific harm—"the detrimental reliance on a duplicitous employee whose real goal is to injure the campaign rather than being an actual employee." (*Id.* at PAGEID#141.) Defendants further argue that the interests served by the statute cannot be achieved through less restrictive means. They argue counter-speech or denouncing is not sufficient because "[t]he harm is in the release of confidential information. (*Id.* at PAGEID#142.) Defendants claim that "[o]nce disclosed the information loses its confidential nature and can 'wreak actual and potential harm' on the campaign." (*Id.*) (citing *Wasden*, 878 F.3d at 1200). Defendants claim that having campaigns conduct background checks on potential employees, requiring confidentiality agreements, and seeking damages for violations of general tort and contract laws is also not sufficient. (*Id.*) These measures would "place burdens on associational rights and might serve to dissuade individuals from participating in a campaign" and would require campaigns "to divert resources to those measures instead of focusing on educating voters on the issues or mobilizing and registering voters." (*Id.*)

42

Defendants' arguments are well-taken. Ohio Revised Code § 3517.21(A)(1) is content-neutral, and has several limiting elements. As set forth above, a person violates the statute when they (1) during the course of a campaign for nomination or election to public office or office of a political party (2) knowingly and with the intent to affect the outcome of that campaign (3) serve, or place another person to serve (4) as an agent or employee in the election campaign organization of a candidate (5) for the purpose of acting to impede the conduct of the candidate's campaign for nomination or election or of reporting information to the employee's employer or the agent's principal without the knowledge of the candidate or the candidate's organization.

The "knowingly" and "with the intent to affect the outcome" elements in particular narrow the statute's scope. In *Wasden*, the Ninth Circuit held that the statute's requirement that a person have the intent to cause economic or other injury to an agricultural production facility "further cabin[ed] the prohibition's scope." 878 F.3d at 1201. The Ninth Circuit disagreed that the statute would apply to someone who had overstated their education or experience to get a job "because the requisite intent to injury would not be satisfied." *Id.* The court acknowledged that it may be true that the goal of undercover employment-based investigations is not secure money or other valuables, but rather to expose threats to the public. *Id.* The court further held that "this does not mean that every investigative reporter hired under false pretenses intends to harm the employer. That is a critical element that requires proof." *Id.*

While the "with the intent to affect the outcome" element is not as narrow as "intent to cause harm," it is still "a critical element that requires proof" and narrows the statute's application. An individual's service in a campaign, even for the purpose of reporting information without the campaign's knowledge, will still only trigger the statute if they also have the requisite intent to affect the outcome of that campaign—to "influence" or "produce an effect upon" the campaign.

*See Affect*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/affect (last visited Nov. 15, 2019). Furthermore, the person who serves must be an agent or employee—another element that Defendants argue narrows the scope of the statute. At oral argument, Defendants argued the statute would not apply to low-level volunteers, and have argued this limitation on agents or employees furthers the state's interest in protecting elections and campaigns and against invasion of privacy because of the additional access that employees usually have to employers' information. (ECF No. 14 at PAGEID#141.) The statute also requires that the purpose of the agent or employee's service is to report information to their principal or employer, not to someone else. Although the statute does not require fraud or that the information reported be confidential or false, malicious, or defamatory, those limitations are not necessary to achieve the interests advanced by the statute. The requirements that the individual have both the intent to affect the outcome of the campaign and seek to report information without the campaign's knowledge sufficiently advance the interests of protecting the associational rights of campaigns and privacy interests.

Finally, Defendants argue that any violation of the statute must be proven by clear and convincing evidence and that the Commission's process has "a variety of procedural safeguards." (*Id.* at PAGEID#143.) These features include complete exhaustion of Commission proceedings prior to criminal prosecution, the requirement that complaints be submitted with supporting affidavit based on personal knowledge under penalty of perjury, monetary sanctions for frivolous complaints, preliminary review of all complaints, full commission hearings if complaints survive preliminary review, state court appellate process to challenge findings, prosecutorial discretion regarding whether to act on a Commission referral, etc. (*Id.*)

Plaintiffs, however, claim that the statute's timing and screening procedures are not narrowly tailored, and point to the Sixth Circuit's decision in *Driehaus* in support of their arguments. (ECF No. 5 at PAGEID#88-90.) In *Driehaus*, the Sixth Circuit found that the Ohio's false statements laws could not survive strict scrutiny, in part because of some of the same Commission procedures applicable here. The court found that while the state's interests in preserving the integrity of its elections, protecting voters from confusion and undue influence, and ensuring that an individual's right to vote was not undermined by fraud in the election process, the laws were not narrowly tailored to protect those interests. 814 F.3d at 474. First, the court found the timing of the administrative process did not necessarily promote fair elections. *Id.* The process provided an expedited timeline for only some complaints, but not all, and even then, there was no guarantee the proceedings would be complete before an election. *Id.* (citing Ohio Rev. Code §§ 3517.154(A)(2)(a), 3517.155, 3517.156(B)(1)). The court also found the process was not narrowly tailored to protect the integrity of elections because it failed to screen out frivolous complaints prior to a probable cause hearing. *Id.* at 474-75 (citing Ohio Rev. Code § 3517.154(A)(1)). The court held that the law was not narrowly tailored because it applied to all false statements, and not just material statements, and was both over-inclusive, because it subjected a campaign that may not be in violation of the law to the process, and under-inclusive, because it did not timely penalize those who violate it. *Id.* at 474-476.

However, the Sixth Circuit's holding in *Driehaus* is distinguishable for two reasons. First, although the Commission's proffered interests in *Driehaus* appear to be the same as the interests here—protecting the integrity of elections—they are not identical. The state's interests in *Driehaus* also involved protecting voters from confusion and undue influence and ensuring an individual's right to vote was not undermined by fraud in the election process. In contrast, the interests

advanced by the statute here include protecting the associational rights of campaigns and protecting against invasion of privacy. Protecting voters from confusion and undue influence and ensuring the right to vote is not undermined by fraud in the election process are directly tied to a particular election, and as the Sixth Circuit found, a finding of a violation of the false statement laws after the election would not protect the integrity of that election or protect voters in that election. While timely resolution of complaints alleging violations of Ohio Revised Code § 3517.21(A)(1) is important, it is perhaps not as vital to protecting the associational rights of a campaign and invasion of privacy at issue here because those interests are not aimed at a particular election. Permitting people who intend to affect the outcome of a campaign to serve as agents or employees for the purpose of reporting information without the campaign's knowledge can have a chilling effect on political participation and association not just for that election, but in future election cycles as well.

Second, the Sixth Circuit analyzed the Commission procedures under strict scrutiny, rather than intermediate scrutiny. The court rejected the Commission's argument that the law should the receive "the less-exacting intermediate scrutiny," *id.* at 474, and noted that "'[i]t is the rare case in which a speech restriction withstands strict scrutiny." *Id.* at 473 (quoting *Reed*, 135 S.Ct. at 2236). Though both strict scrutiny and intermediate scrutiny inquire as to whether a regulation is "narrowly tailored," the Supreme Court has said that to satisfy narrow tailoring in the intermediate scrutiny context, the regulation need not be the least restrictive or least intrusive means of advancing a government interest. *Turner*, 512 U.S. at 662; *Ward*, 491 U.S. at 799.

The timing procedures and lack of screening for frivolous complaints may not be "the least restrictive or least intrusive means" of advancing the state's interests," but they need not be under intermediate scrutiny. The Commission's process still provides some procedural safeguards for

complaints under Ohio Revised Code § 3517.21(A)(1). All complaints must be filed with a supporting affidavit on personal knowledge and under penalty of perjury. Ohio Rev. Code. § 3517.153(A). There is an expedited timeline for complaints filed close to elections. Ohio Rev. Code §§ 3517.154(A)(2)(b), 3517.156(B)(1). There is a preliminary review hearing for all complaints in which respondents can, but are not required, to participate. Ohio Admin. Code § 3517-1-11(A); (*see also* ECF No. 14-1, Richter Aff. ¶¶ 6-7.) After dismissing a complaint, the Commission can find it was frivolous and order the complainant to pay reasonable attorney's fees and costs. Ohio Rev. Code § 3517.155(E). The statute has several limiting elements that must be established, and violations must be proven by "clear and convincing evidence." Ohio Rev. Code § 3517.155(D)(1). Accordingly, Ohio Revised Code § 3517.21(A)(1) does not "'burden substantially more speech than is necessary to further the government's legitimate interests,'" *Turner*, 512 U.S. at 662 (quoting *Ward*, 491 U.S. at 799), and survives intermediate scrutiny.

### iv.    Overbreadth Analysis

Despite bringing a facial challenge to the statute under the First Amendment, Plaintiffs did not separately argue the statute is substantially overbroad—except at oral argument—as required in an overbreadth challenge. *See Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013). Such a challenge argues that the statute "prohibits a substantial amount of protected speech both in an absolute sense and relative to [the statute's] plainly legitimate sweep[.]" *Id.* But "[e]ven in free-speech cases, however, facial invalidation of a statute remains 'strong medicine that is not to be causally employed.'" *Connection Distributing Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) (quoting *Williams*, 128 S.Ct. at 1838). Even then, facial challenges remain "'disfavored.'" *Id.* The burden of demonstrating substantial overbreadth is on the claimant. *Id.* at 336.

Plaintiffs have not met their burden of showing the statute is substantially overbroad. Moreover, because the Court finds that Ohio Revised Code § 3517.21(A)(1) is a content-neutral law that survives intermediate scrutiny under *O'Brien*, it is not substantially overbroad. *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 392-93 (6th Cir. 2005) ("In the end, the school district has satisfied all three prongs of the *O'Brien* test, which necessarily establishes that the Blaus have not met their burden of showing that they are entitled to 'the strong medicine of overbreadth invalidation.'") (quoting *Virginia v. Hicks*, 539 U.S. 113, 120 (2003)).

Accordingly, Plaintiffs are not likely to succeed on the merits of their First Amendment claim.

### b. Irreparable Harm

Plaintiffs have not shown they are likely to suffer irreparable harm absent a preliminary injunction. While it is "well-settled that loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) (internal quotations omitted), Plaintiffs have not demonstrated a First Amendment injury here. *See Jolivette v. Huste*d, 886 F.Supp.2d 820, 837 (S.D. Ohio 2012) *aff'd*, 694 F.3d 760 (6th Cir.2012) ("Because Plaintiff has not substantially demonstrated a constitutional violation, the Court is unable to conclude that irreparable harm has been established for the purpose of issuing a preliminary...injunction.").

### c. Substantial Harm to Others and Public Interest

Finally, the Court considers whether an injunction would cause substantial harm to others and whether the public interest would be served by an injunction. As explained above, Defendants have set forth several important government interests served by the statute that would be frustrated if the statute is enjoined, potentially causing harm to the campaigns and electorate intended to be

protected by the statute. And in "First Amendment cases, 'the determination of where public interest lies...is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge[.]'" *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (citing *Connection Distributing*, 154 F.3d at 288). "[I]f the regulation in question is likely to be deemed constitutional, the public interest will not be harmed by its enforcement." *Id*. Because the Plaintiffs are unlikely to succeed on the merits of the First Amendment claim, an injunction would not be in the public's interest.

## VI.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction (ECF No. 5).


**IT IS SO ORDERED.**


<u>  11-20-2019  </u>
**DATE**                                  **EDMUND A. SARGUS, JR.**
                                          **UNITED STATES DISTRICT JUDGE**